# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

Howard Hughes Medical Institute,

    Plaintiff,

  v.

Factory Mutual Insurance Company,

    Defendant.

Civil Action No.  07-420***

**JURY TRIAL DEMANDED**

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION
## TO DEFENDANT'S MOTION TO CHANGE VENUE

*Of Counsel:*

Richard P. Lewis
Marshall Gilinsky
ANDERSON KILL & OLICK, P.C.
1251 Avenue of the Americas
New York, New York 10020-1182
(212) 278-1000

POTTER ANDERSON & CORROON LLP
David J. Baldwin (No. 1010)
Jennifer C. Wasson (No. 4933)
Hercules Plaza
1313 North Market Street, 6th Floor
Wilmington, Delaware  19801
(302) 984-6017
E-mail:  dbaldwin@potteranderson.com
    jwasson@potteranderson.com

*Attorneys for Plaintiff Howard Hughes Medical Institute*

Dated:  August 9, 2007

## TABLE OF CONTENTS

Pages

PRELIMINARY STATEMENT ...................................................................... 1

FACTUAL BACKGROUND ........................................................................ 1

ARGUMENT .............................................................................................. 4

I.    THE DISTRICT OF DELAWARE IS AN APPROPRIATE
FORUM FOR THIS ACTION BECAUSE FM RESIDES THERE, PURSUANT
TO 28 U.S.C. §1391(C) .................................................................... 4

II.    THIS ACTION SHOULD NOT BE TRANSFERRED BECAUSE
THIS COURT IS THE MOST APPROPRIATE FORUM ................................. 5

    A.    FM Misstates the Facts at Issue in the Motion To Transfer ...................... 5

    B.    FM Must Meet a Heavy Burden To Justify Transfer
and Overcome the Presumption in Favor of the
Plaintiff's Choice of Forum ................................................................ 7

    C.    The Relevant Factors Do Not Favor Transfer of This Action ................... 8

        1.    The Relevant Private Factors Demonstrate
that Transfer is Inappropriate .................................................... 9

        2.    The Relevant Public Factors Weigh Against Transfer ................ 11

CONCLUSION ........................................................................................ 13

# TABLE OF AUTHORITIES

**CASES**                                                                                           **PAGES**

*Alcoa Inc v. Alcan Inc.,*
    Civ. No. 06-451-SLR, 2007 WL 1948821 (D. Del. July 2, 2007)..............................................9

*Armstrong v. Pomerance,*
    423 A.2d 174 (Del. 1980) ........................................................................................12

*Behring Diagnostics GmbH v. Biosite Diagnostics, Inc.,*
    C.A. No. 97-501 MMS, 1998 WL 24354 (D. Del. Jan. 6, 1998).......................................11-12

*C.R. Bard, Inc. v. Guidant Corp.,*
    997 F. Supp. 556 (D. Del. 1998)..........................................................................9, 11-12

*Critikon v. Becton Dickinson Vascular Access, Inc.,*
    821 F. Supp. 962 (D. Del. 1993)..............................................................................8-9

*Datex-Ohmeda, Inc. v. Hill-Rom Servs., Inc.,*
    185 F. Supp.2d 407 (D. Del. 2002)........................................................................Passim

*Gould Electronics Inc. v. U.S.,*
    220 F.3d 169 (3d. Cir. 2000)......................................................................................9

*In re Hechinger Inv. Co. of Del., Inc.,*
    296 B.R. 323 (Bankr. D. Del. 2003) ........................................................................8, 9

*Joint Stock Soc'y "Trade House of Descendants of Peter Smirnoff, Official Purveyor to
    the Imperial Court" v. Heublin Inc.,*
    936 F. Supp. 177 (D. Del. 1996)...............................................................................12

*Jumara v. State Farm Ins. Co.,*
    55 F.3d 873 (3d. Cir. 1995)....................................................................................8, 10

*Media Group, Inc. v. Turtle Wax, Inc.,*
    C.A. No. 96-234 MMS, 1996 WL 756760 (D. Del. Dec. 23, 1996) ....................................12

*Motorola, Inc. v. PC-Tel, Inc.,*
    58 F. Supp.2d 349 (D. Del. 1999).............................................................................11

*SportsMedia Tech. Corp. v. Upchurch,*
    839 F. Supp. 8 (D. Del. 1993)...................................................................................12

*Traynor v. Liu,*
    Civ. No. 06-441-SLR, 2007 WL 2039526 (D. Del. July 17, 2007)..........................................5

**STATUTES**

28 U.S.C. §1391(a)(1)(c) ..........................................................................................................4

28 U.S.C. §1391(a)(3)................................................................................................................4

28 U.S.C. §1391(c) ...................................................................................................................4

10 Del.C. § 3104 (2007) ...........................................................................................................5

Fed. R. Civ. P. 56......................................................................................................................6

Plaintiff, Howard Hughes Medical Institute, ("HHMI"), by its undersigned counsel, respectfully submits this Memorandum of Law in opposition to the Motion To Change Venue Forum Non Conveniens (the "Motion") filed on July 27, 2007 by Defendant, Factory Mutual Insurance Company ("FM").

## PRELIMINARY STATEMENT

This action arises out of FM's breach of a $500,000,000 property insurance policy that FM sold to HHMI to cover more than 60 locations in approximately 25 states across the United States. Because HHMI is incorporated in Delaware and FM does business in Delaware, HHMI originally filed its complaint for breach of contract and declaratory judgment in Delaware Superior Court. On July 3, 2007, FM removed the Action to this Court and now brings the instant Motion to transfer it to the United States District Court for the Northern [sic] District of Virginia .[1]

This Court should deny FM's Motion To Transfer because: (i) controlling law dictates that HHMI's choice of forum be given substantial deference; and (ii) the factors used to determine whether transfer is warranted favor keeping this Action in Delaware. Because FM cannot meet its heavy burden of establishing that the relevant factors weigh strongly in favor of transfer, FM's Motion To Transfer should be denied.

## FACTUAL BACKGROUND

This is an action for breach of contract and declaratory judgment involving a $500,000,000 property insurance policy which FM sold to HHMI for the policy period from April 1, 2005 until April 1, 2006, bearing Policy No. LP591 (the "Policy"). A copy of the Policy

---

[1] HHMI notes that there is no United States District Court for the Northern District of Virginia; rather, Virginia's Federal courts include those in the Eastern District and the Western District. Accordingly, for the purposes of responding to the Motion, HHMI presumes that FM intended to have this action transferred to the Eastern District of Virginia.

is attached as Exhibit 1" to the Affidavit of Susan Plotnick in Opposition to Defendant's Motion

To Transfer (the "Plotnick Aff."), attached hereto as Exhibit "A". On February 5, 2006, Plaintiff

suffered a fire loss at its Janelia Farm Research Campus located in Ashburn, Virginia. Plaintiff

has provided FM with timely notice of the loss, as well as documentation regarding its covered

losses caused by the fire (the "Janelia Farm Claim"). Although Plaintiff has, as of February

2007, incurred covered losses of approximately $5.3 million, and has submitted a Sworn

Statement in Partial Proof of Loss to that effect, FM has refused to honor its obligations under

the Policy and, instead, has only paid Plaintiff slightly more than $3.5 million for the Janelia

Farm Claim. HHMI is incorporated in Delaware and has its headquarters and principal place of

business in Chevy Chase, Maryland. *See* Complaint, attached to FM's Motion as Exhibit A, at ¶

9. FM is a Rhode Island corporation with its principal place of business in Rhode Island. *See*

Answer to Complaint, attached to FM's Motion as Exhibit B, at ¶ 3.

       For most years since approximately 1992, HHMI has purchased from FM a

blanket property insurance policy that covered, among other things, all of the real and personal

property that HHMI owned or in which HHMI had an insurable interest across the Unites States

– typically between 60 and 75 locations located in approximately 25 states. *See* Plotnick Aff., at

¶¶ 1-3, 7. Since 1988, Ms. Plotnick was the person at HHMI who was responsible for procuring

HHMI's property insurance coverage, a task which she performed from HHMI's headquarters in

Chevy Chase, Maryland. *See* Plotnick Aff. at ¶¶ 1-2. Until August 31, 2004,  HHMI's blanket

property insurance policies were procured with the assistance of James Smith, an insurance

broker out of Willis' office in Bethesda, Maryland. *See* Plotnick Aff. at ¶ 3.

       In late 2004, HHMI sought to renew its blanket property insurance coverage with

FM. Towards that end, Ms. Plotnick engaged in communications with FM's representative,

Peter Hardinge, from her office in Chevy Chase, Maryland. *See* Plotnick Aff. at ¶¶ 6, 9. HHMI's 2005 renewal policy was procured with the assistance of Charles Reilly, an Aon broker located in Philadelphia, Pennsylvania and Audrey Greening, an Aon broker from Aon's Washington, D.C. office. *See* Plotnick Aff. at ¶¶ 4, 9. There was one in-person meeting that took place during the negotiation of the 2005 renewal, which took place on January 20, 2005 at HHMI's headquarters in Chevy Chase, Maryland. *See* Plotnick Aff. at ¶¶ 10-11 and Exhibit 2 attached thereto. On or about May 6, 2005, FM issued a renewal blanket property insurance policy designed to cover all of HHMI's locations nationwide for the policy period April 1, 2005 – April 1, 2006. *See* Policy, Plotnick Aff. Exhibit 1. As noted on the cover page of the Policy, it was issued by FM on May 6, 2005 from FM's home office in Johnston, Rhode Island. *See* Policy, Plotnick Aff. Exhibit 1 at cover page. After it was issued by FM, Peter Hardinge delivered a copy of the Policy by hand to Ms. Plotnick at HHMI's headquarters in Chevy Chase, Maryland. *See* Plotnick Aff. at ¶ 13.

On February 5, 2006 there was a fire at one of the locations insured under the Policy, badly damaging a building under construction that included studio apartments for staff and visitors at HHMI's Janelia Farm campus (the "Studio Building"). *See* Complaint, attached to FM's Motion as Exhibit A, at ¶ 23.

The damage to the Studio Building is covered under the Policy. To date, HHMI has incurred covered losses of approximately $5.3 million, and has submitted a Sworn Statement in Partial Proof of Loss to that effect. *See* Complaint, attached to FM's Motion as Exhibit A, at ¶ 41. Nevertheless, FM has refused to honor its obligations under the Policy. *See* Complaint, attached to FM's Motion as Exhibit A, at ¶ 37-43. Instead, FM has paid HHMI just over $3.5 million, via several separate advance payments from a bank in Rhode Island. *See* Plotnick Aff. at

3

¶ 15 and the check stub and wire transfer records attached thereto as Exhibit "3". HHMI's employees at its headquarters in Chevy Chase, Maryland, including Ms. Plotnick, have been responsible for pursuing its insurance claim with FM. *See* Plotnick Aff. at ¶ 14. FM has handled the claim out of its office in Reston, Virginia; but it is likely that the FM employees with authority to pay the full amount of the claim (and presumably who have made the decision to refuse to pay) work in Rhode Island.

## ARGUMENT

**I.    THE DISTRICT OF DELAWARE IS AN APPROPRIATE FORUM FOR THIS ACTION BECAUSE FM RESIDES THERE, PURSUANT TO 28 U.S.C. §1391(c)**

FM's first, and presumably best, argument for transfer is that venue is improper in this Court, purportedly because the only provision of the venue statute that applies is §1391(a)(3), which provides that venue is proper in "a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought." *See* Motion at pp. 3-4 (*quoting* 28 U.S.C. §1391(a)(3) (emphasis in original)). FM's argues that because §1391(a)(3) is the only basis for venue, and because this Action could have been brought in another district, it cannot be maintained here in Delaware. But FM's argument is badly conceived or intentionally misleading, as it completely (and for FM, conveniently) overlooks §1391(c), which provides that "a defendant that is a corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction . . .". Given that definition, venue plainly is proper in this Court pursuant to §1391(a)(1) which allows suit in "a judicial district where any defendant resides, if all defendants reside in the same State," since FM is subject to personal jurisdiction in Delaware and HHMI is incorporated here. *See* 28 U.S.C. §1391(a)(1)(c).

In case FM tries to use its Reply to dispute the fact that it is subject to personal jurisdiction in Delaware, HHMI notes that Delaware's long-arm statute extends personal jurisdiction over parties that transact business within Delaware. *See* 10 Del. C. § 3104 (2007). FM has already conceded that it transacts business in Delaware. *See* Affidavit of Deborah H. Almo to the Motion To Transfer Venue, at ¶12. Since FM is transacting business here in Delaware, it is subject to personal jurisdiction in Delaware. *See Traynor v. Liu*, Civ. No. 06-441-SLR, 2007 WL 2039526, at *5 (D. Del. July 17, 2007). Accordingly, FM's first argument does not justify transfer.

## II.    THIS ACTION SHOULD NOT BE TRANSFERRED BECAUSE THIS COURT IS THE MOST APPROPRIATE FORUM

FM's Motion misrepresents the relevant facts at issue, in a desperate attempt to deprive HHMI of its right as Plaintiff to choose the forum for resolving this dispute. After cutting through FM's distortions and applying the relevant factors for determining whether transfer is appropriate, it is very clear that transfer is not appropriate here.

### A.    FM Misstates the Facts at Issue in the Motion To Transfer

FM is either misinformed or attempting to mislead this Court when it avers that Virginia lies at the hub of all of the events that are relevant to this insurance coverage dispute. In reality, this case has no single hub; rather, it derives from and relates to matters in Delaware, Maryland, Pennsylvania, Rhode Island, Virginia and the 20+ other states where property covered under the Policy is located.

As an initial matter, the factual support for FM's Motion is based on an affidavit from an FM employee who does not appear to be personally familiar with the underwriting of the Policy. In her affidavit in support of FM's Motion, Deborah Almo states that she is the "Operations Vice President and Operations Claims Manager" at FM's Reston, Virginia office.

5

*See* Almo Aff. at ¶ 1. Ms. Almo was the account executive on HHMI's account for a short period of time in the past, but not recently. *See* Plotnick Aff. at ¶ 5. Moreover, even when she was the account executive on the HHMI account, she was not responsible for underwriting. Thus, it comes as no surprise that Ms. Almo's Affidavit fails to affirm that she is personally familiar with the facts set forth therein – which relate to the negotiation, underwriting and issuance of the Policy – as is required for such testimony to be considered by the Court. *See, e.g.*, Fed. R. Civ. P. 56 ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.").

More importantly, Ms. Almo's affidavit appears to be wrong with regard to almost all of the relevant facts. Ms. Almo's affidavit includes at least three pieces of misleading testimony about key facts relevant to the Motion. *First*, Ms. Almo testifies that "the negotiations surrounding the Policy took place at the loss location in Ashburn, Virginia." Almo Aff. at ¶5. This testimony is clearly contradicted by Ms. Plotnick – who <u>was</u> personally involved in the negotiations surrounding the Policy – as well as documents created contemporaneous with those negotiations. As described in Ms. Plotnick's Affidavit, there was one face-to-face meeting (the "Meeting") between FM, HHMI and HHMI's brokers relating to the procurement of the Policy, and it took place at HHMI's headquarters in Chevy Chase, Maryland on January 20, 2005. *See* Plotnick Aff. at ¶¶ 10-11 and Exhibit 2 attached thereto. The agenda from the Meeting confirms that it took place in Maryland – not the "loss location in Reston, Virginia" as Ms. Almo avers – and further states that it was attended by Ms. Plotnick, Mr. Harding, and HHMI's Insurance Brokers from Philadelphia and Virginia. *See* Plotnick Aff. Exhibit 2.[2] Accordingly, FM is not

---

[2]   It should also be noted that Ms. Almo was *not* at the January 20, 2005 Meeting. *See* Plotnick Aff. at ¶ 11 and Exhibit 2 attached thereto.

correct in stating to this Court that "the negotiations surrounding the Policy" took place in Virginia.

*Second*, Ms. Almo testifies that the Policy was "issued from [FM's] Reston, Virginia office." *See* Almo Aff. at ¶ 5. Contrary to this declaration – made by someone not involved in the underwriting of the Policy – the Policy on its face clearly states that it was issued in Rhode Island:



In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I. this 6th day of May 2005

Authorized Signature          Secretary          President

*See* Policy, Plotnick Aff. Exhibit 1, at cover page. Thus, the Policy itself leaves FM's testimony about this key fact is in grave doubt.

*Third*, Ms. Almo avers that the "claims payment processing was done at [FM's] Reston, Virginia office." *See* Almo Aff. at ¶ 5. This testimony is contradicted by FM's own documents; the check stub and wire records from FM's partial payments on this claim show that the payments were made from Rhode Island. *See* Plotnick Aff. at Exhibit 3. The dubious nature of Ms. Almo's testimony, on which FM's arguments largely rest, casts a doubtful light on the merit of FM's Motion To Transfer.

**B.    FM Must Meet a Heavy Burden To Justify Transfer and Overcome the Presumption in Favor of the Plaintiff's Choice of Forum**

On a motion to transfer, the burden is on the moving party to overcome the strong presumption in favor of the plaintiff's choice of forum. As this Court has noted, "the burden is upon the movant to establish that the balance of the interests strongly weighs in favor of transfer." *See Datex-Ohmeda, Inc. v. Hill-Rom Servs., Inc.*, 185 F. Supp. 2d 407, 412 (D. Del.

2002); *see also In re Hechinger Inv. Co. of Del., Inc.*, 296 B.R. 323, 325-26 (Bankr. D. Del. 2003). This Court has also held that and that the plaintiff's choice of forum "should be given substantial deference" and that transfer will be denied if the factors are evenly balanced or weigh only slightly in favor of the transfer. *Datex-Ohmeda,* 185 F. Supp. 2d at, 412; *Critikon v. Becton Dickinson Vascular Access, Inc.*, 821 F. Supp. 962, 964 (D. Del. 1993). Because FM cannot meet its heavy burden here, the Motion To Transfer should be denied.

### C.    The Relevant Factors Do Not Favor Transfer of This Action

The Third Circuit has set forth a list of private and public factors which the Court is to consider in determining whether to transfer a case under § 1404(a). As noted by FM in its citation to *Jumara v. State Farm Ins. Co.*, 55 F.3d 873 (3d. Cir. 1995), a case in which the court held that the plaintiff's choice of forum should not have been disturbed, the relevant private factors include: (1) plaintiff's forum preference; (2) defendant's forum preference; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses to the extent they may be unavailable for trial in the fora; and (6) the location of sources of proof to the extent such proof is unavailable for trial in the fora. *Jumara,* 55 F.3d at 879. The relevant public factors include: (1) the enforceability of the judgment; (2) practical considerations that could make the trial easy, expeditious or inexpensive; (3) the relative administrative difficulty in the two fora resulting from court congestion; (4) the local interest in deciding local controversies at home; (5) the public policies of the fora; and (6) the familiarity of the trial judge with the applicable state law in diversity cases. *Id.* Application of these factors here dictates that this Action not be transferred to a District Court in Virginia.

1.    **The Relevant Private Factors Demonstrate that Transfer Is Inappropriate**

The first private factor – plaintiff's forum preference – clearly favors Delaware. The Plaintiff here has demonstrated a clear preference for Delaware, as HHMI is incorporated in Delaware and filed its action in Delaware. The second private factor – defendant's forum choice – favors Virginia, since FM prefers that this case be transferred to Virginia. Under the applicable precedent, the plaintiff's choice of forum outweighs the defendant's preference. *C.R. Bard, Inc. v. Guidant Corp.*, 997 F. Supp. 556, 562 (D. Del. 1998). Indeed, the cases on point speak of a "presumption" in favor of the plaintiff's choice. *See Datex-Ohmeda,* 185 F. Supp. 2d at 412; *Critikon*, 821 F. Supp. at 964; *In re Hechinger Inv. Co. of Del., Inc.*, 296 B.R. at 325-26. Further, Delaware's "home turf" rule applies when the plaintiff is incorporated within this State. *Alcoa Inc v. Alcan Inc.*, Civ. No. 06-451-SLR, 2007 WL 1948821, at *1 (D. Del. July 2, 2007); *see also Gould Electronics Inc. v. U.S.,* 220 F.3d 169 (3d. Cir. 2000). Pursuant to the "home turf" rule, a plaintiff's choice of forum is afforded more deference when the plaintiff resides in the state chosen. HHMI resides in Delaware, since it is incorporated here, and is entitled to the benefit of Delaware's "home turf" rule.

The third private factor – where the claim arose – also favors HHMI. This is a breach of contract action that arose between a resident of Delaware and Maryland on one hand and a resident of Rhode Island on the other. Although the fire relevant to this contractual dispute took place in Virginia, the contract at issue also covers property in approximately 25 other states. *See* Policy, Plotnick Aff. Exhibit 1, at "Appendix Schedule of Location." Indeed, FM has taken the position in pleadings filed in other cases that suits involving such blanket property insurance policies should not be overly concerned only with the specific location that suffered a loss,

giving rise to the insurance claim.  For example, in *Retail Brand Alliance v. Factory Mutual Insurance Company*, FM told the District Court for the Southern District of New York that:

> "Despite RBA's contention that the World Trade Center stores were their most profitable and most important, there is no indication anywhere in the Policy or Schedule of Locations that these stores were treated any differently for insurance purposes. Rather, the World Trade Center stores were subject to the same terms and conditions as any other of RBA's hundreds of stores."

*See* FM's Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment attached as Exhibit 1 to the Affidavit of Marshall Gilinsky in Opposition to FM's Motion To Transfer, attached hereto as Exhibit B.  FM must not be able to talk out of both sides of its mouth to different courts and different policyholders.  The key facts regarding where this insurance coverage action arose relate to the formation of the contract in Maryland, Pennsylvania, Rhode Island and Virginia – not exclusively to Virginia which was the site of the Janelia Farm fire.

The fourth, fifth and sixth private factors – convenience of the parties, convenience of the witnesses and location of proof – also favor Delaware.  Although Virginia is more convenient for the one or two FM's witnesses, it is not more convenient with respect to witnesses and evidence located in Rhode Island and Pennsylvania.  Moreover, if the case is assigned to the Eastern District of Virginia's courts in Norfolk, Newport News or Richmond – as opposed to the court in Alexandria – transfer to Virginia actually would be less convenient for HHMI's witnesses in Chevy Chase, Maryland and FM's employees in Reston, Virginia, since Wilmington is closer to them than Norfolk, Newport News or Richmond.  It should also be noted that FM's Motion overlooks a key point about how courts are to weigh the convenience of the parties – cases on point hold that courts should consider the parties' relative physical and financial condition in determining whether the parties are inconvenienced by having to litigate in the plaintiff's chosen forum.  *See Jumara*, 55 F.3d at 879.  Here, there is no allegation that FM is

unable to litigate in Delaware, or that litigating in Delaware would be financially more burdensome to FM than litigating in Virginia. *Motorola, Inc. v. PC-Tel, Inc.*, 58 F. Supp. 2d 349, 358 (D. Del. 1999); *Behring Diagnostics GmbH v. Biosite Diagnostics, Inc.*, C.A. No. 97-501 MMS, 1998 WL 24354, at *5 (D. Del. Jan. 6, 1998) ("both parties are national corporations with revenues in the millions of dollars… As such the relative economic burden … [of] litigating in Delaware is minimal."). Indeed, FM has chosen to be represented by counsel located in Philadelphia, who will have to travel right through Wilmington to get to any of the courthouses to which FM seeks to transfer this action. Moreover, a corporation with substantial interests that operates on a national level must show some "unique or unexpected" burden associated with defending the action in plaintiff's chosen forum. *Motorola Inc.*, 58 F. Supp.2d at 358; *C. R. Bard, Inc.*, 997 F.Supp. at 562. FM cannot meet the burden here. Although FM finds this Court to be "remote", and thus less accessible, a review of all relevant facts shows this forum to be more convenient than any federal courthouse in Virginia.

### 2. The Relevant Public Factors Weigh Against Transfer

A weighing of the public factors cited in *Jamara* also dictates that this action should remain here in Delaware. The first public factor – the enforceability of the judgment – does not favor one venue over the other. Under such circumstances, the presumption favoring the plaintiff should not be disturbed.

The second public factor – ease, speed, and expense – favors Delaware. FM fails to recognize the administrative efficiencies that this Court regularly employs to expedite litigation. For example, this Court routinely employs telephonic conferences for appearances, which would reduce the need for counsel from out of town to travel to Delaware extensively. This Court also employs efficient trial management practices, streamlines litigation, and has a relatively well-developed and predictable body of case law on insurance coverage disputes on

which to base its analysis of the merits in the present case. Accordingly, it cannot be said that this Court cannot handle this matter with exemplary ease, speed and expense.

The third public factor – relative administrative difficulty resulting from court congestion – also favors Delaware. Indeed, this Court has frequently denied motions to transfer because of the plaintiff's rational decision to select this Court on the basis of its efficient case management. *See, e.g., Joint Stock Soc'y "Trade House of Descendants of Peter Smirnoff, Official Purveyor to the Imperial Court" v. Heublin Inc.*, 936 F. Supp. 177, 187 (D. Del. 1996); *C. R. Bard, Inc.*, 997 F. Supp. at 562; *Media Group, Inc. v. Turtle Wax, Inc.*, C.A. No. 96-234 MMS, 1996 WL 756760, at *7 (D. Del. Dec. 23, 1996); *SportsMedia Tech. Corp. v. Upchurch*, 839 F. Supp. 8, 11 (D. Del. 1993); *Behring Diagnostics*, 1998 WL 24354, at *4 (D. Del. Jan. 6, 1998). Accordingly, this Court's exemplary ability to manage its docket supports protection of Plaintiff's choice of forum.

The fourth and fifth public factors – deciding local controversies at home, and public policies of the fora – favors Delaware, too. "Delaware has a strong interest in providing a forum for redress of injuries inflicted upon or by a Delaware domiciliary, i.e., the Delaware corporation." *Armstrong v. Pomerance*, 423 A.2d 174, n.5 (Del. 1980). Indeed, this Court clearly and repeatedly has stated that Delaware has an interest in resolving controversies among its corporate citizens. *See, e.g., Datex-Ohmeda, Inc.*, 185 F. Supp. 2d at 412. Accordingly, this factor favors keeping this case here in Delaware.

The sixth public factor – the familiarity of the trial judge with the applicable state law in diversity cases – does not favor one venue over the other, since both this Court and the District Court in Virginia have the knowledge required to apply the law. Under such circumstances, the presumption favoring the plaintiff should not be disturbed. Thus, after

weighing all private and public factors, it is clear that FM cannot meet is burden of showing that "the balance of the interests strongly weighs in favor of transfer." *Datex-Ohmeda*, 185 F. Supp. 2d at 412 (D. Del. 2002). Accordingly, the HHMI's choice of forum should not be disturbed and the Motion To Transfer should be denied.

## CONCLUSION

For all the reasons stated above, the Court should not disturb HHMI's choice to resolve this dispute in Delaware and should deny FM's Motion To Transfer in its entirety.

Dated:    August 9, 2007

*Of Counsel:*                                     POTTER ANDERSON & CORROON LLP

Richard P. Lewis
Marshall Gilinsky                                By /s/ David J. Baldwin
ANDERSON KILL & OLICK, P.C.                          David J. Baldwin (No. 1010)
1251 Avenue of the Americas                          Jennifer C. Wasson (No. 4933)
New York, New York 10020-1182                        Hercules Plaza
(212) 278-1000                                       1313 North Market Street, 6th Floor
                                                     Wilmington, Delaware 19801
                                                     (302) 984-6017
                                                     E-mail:  dbaldwin@potteranderson.com
                                                              jwasson@potteranderson.com

                                                 *Attorneys for Plaintiff Howard Hughes Medical Institute*

811867

NYDOCS1-868744.3

13

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I, David J. Baldwin, hereby certify that, on August 9, 2007, the foregoing **Plaintiff's Memorandum Of Law In Opposition To Defendant's Motion To Change Venue with Exhibits A-B** was filed electronically with the Clerk of Court using CM/ECF which will send notification of such filing to the following Delaware attorney of record for Defendant stating that the document is available for viewing and downloading from CM/ECF, and that a copy was served by e-mail and by hand on the following Delaware attorney of record:

Robert S. Goldman, Esquire
Lisa C. McLaughlin, Esquire
PHILLIPS, GOLDMAN & SPENCE, P.A.
1200 North Broom Street
Wilmington, DE 19806

and that a copy was served by e-mail and first-class mail on the following non-Delaware counsel for Defendant:

Thomas S. Brown, Esquire
GIBBONS, P.C.
1700 Two Logan Square
18th and Arch Street
Philadelphia, PA 19103

/s/ David J. Baldwin
David J. Baldwin (No. 1010)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 North Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
E-Mail: dbaldwin@potteranderson.com

811762

# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Howard Hughes Medical Institute,<br><br>               Plaintiff,<br><br>   v.<br><br>Factory Mutual Insurance Company,<br><br>              Defendant. | Civil Action No.  07-420<br><br>**Affidavit of Susan Plotnick In Support of Howard Hughes Medical Institute's Opposition to Defendant's Motion To Change Venue** |

STATE OF MARYLAND      )
                           )ss.
COUNTY OF MONTGOMERY   )

SUSAN PLOTNICK, being duly sworn, deposes and says:

1.      I have been the Risk Manager and Assistant Treasurer for the Howard Hughes Medical Institute ("HHMI") from 1988 to the present.  I am personally familiar with the facts and circumstances set forth herein.

2.      In my capacity as the Risk Manager, I am responsible for, among other things, the negotiation and procurement of HHMI's property insurance, a task which I have always performed from HHMI's headquarters in Chevy Chase, Maryland.

3.      Until August 31, 2004, HHMI's blanket property insurance policies were procured with the assistance of James Smith, an insurance broker in Willis' office in Bethesda, Maryland.

4.      From September 1, 2004 to the present, HHMI's blanket property insurance policies were procured with the assistance of Charles Reilly, an insurance

broker in Aon's office in Philadelphia, Pennsylvania and Audrey Greening, an insurance broker in Aon's office in Washington, D.C.

5.    Throughout HHMI's relationship with FM, there have been many account executives serving as the contact for HHMI at FM.  Deborah Almo, who worked out of FM's office in Reston, Virginia, was the contact for HHMI for only a short period of time in the past and not recently.

6.    For several years until the present, my contact at FM has been Peter Hardinge, who works out of FM's office in Reston, Virginia.

7.    In 2005, HHMI bought a $500,000,000 blanket property insurance policy (the "Policy") to cover over 60 locations in approximately 25 states across the United States for the policy period April 1, 2005 - April 1, 2006.

8.    Attached hereto as Exhibit 1 is a true and correct copy of the Policy.

9.    In procuring the Policy, I spoke on the phone and communicated via email from my office in Chevy Chase, Maryland with Charles Reilly in Philadelphia, Audrey Greening in Washington, D.C. and Peter Hardinge, in Reston, Virginia.

10.    There was one face-to-face meeting (the "Meeting") between HHMI and FM relating to the procurement of the Policy.

11.    The Meeting took place at HHMI's headquarters in Chevy Chase, Maryland on January 20, 2005.  I do not recall Deborah Almo attending the January 20, 2005 Meeting.

12.    Attached hereto as Exhibit 2 is a true and correct copy of the Agenda from the January 20, 2005 meeting.

13.    Consistent with his practice of previous years, some time after the Policy was issued, Peter Hardinge delivered a copy by hand to my office in Chevy Chase, Maryland.

14.    HHMI has sought coverage under the Policy for its losses stemming from a fire at HHMI's Janelia Farm campus on February 5, 2006.  Most, if not all, of the HHMI employees involved in pursuing this insurance claim work at HHMI's headquarters in Chevy Chase, Maryland.

15.    HHMI has received partial payments from FM totaling just over $3.5 million on the insurance claim at issue.

16.    Attached hereto as Exhibit 3 are true and correct copies of the check stub and wire transfer records from FM's partial payments to HHMI on the insurance claim at issue.


Dated:       August 9, 2007

Susan Plotnick

Sworn to before me this
9th day of August, 2007

Mary Lyn Parke
My commission expires June 26, 2011.

# EXHIBIT 1

**FM** Global

Factory Mutual Insurance Company
P.O. Box 7500
Johnston, Rhode Island 02919
1-800-343-7722

# MUTUAL CORPORATION
# NON-ASSESSABLE POLICY

## DECLARATIONS

| Policy No. | Previous Policy No. | DATE OF ISSUE |
|---|---|---|
| LP591 | LP522 | May 6, 2005 |

| Account No. | Replaces Binder No. | |
|---|---|---|
| 1-78868 | | |

In consideration of this Policy's Provisions, Conditions, Stipulations, Exclusions and Limits of Liability, and of premium charged, Factory Mutual Insurance Company, hereafter referred to as the Company, does insure:

> **INSURED:**
>
> Howard Hughes Medical Institute
>
>
>
> (For Complete Title See Policy)

The term of this Policy is from the 1st day of April 2005 to the 1st day of April 2006 at 12:01 a.m., Standard Time, at the Locations of property involved as provided in this Policy.

This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

By virtue of this Policy and any other policies purchased from the Company being in force, the Insured becomes a member of the Company, subject to the provisions of its charter and by-laws, and is entitled to one vote either in person or by proxy at any and all meetings of said Company.

Assignment of this Policy will not be valid except with the written consent of the Company.

This Policy is made and accepted subject to the above provisions and those hereinafter stated, which are made a part of this Policy, together with such other provisions and agreements as may be added to this Policy.

In Witness, this Company has issued this Policy at its office in the city of Johnston, R. I.
this 6th day of May 2005

_____
Authorized Signature

_____
Secretary

_____
President

Countersigned (if required) this          day of          _____
                                                                                    Agent

Form FMGA DEC
7020 (5/99)

Printed in U.S.A.

This policy is issued by a mutual company having special regulations lawfully applicable to its organization, membership, policies, or contracts of insurance of which the following shall apply to and form a part of this policy.

## EXTRACTS FROM CHARTER OF THIS COMPANY
### Granted by the General Assembly of the State of Rhode Island

SECTION 5.  Except as hereinafter specifically provided, each natural person, partnership, association, corporation or legal entity insured on the mutual plan by the Corporation shall be a member of the Corporation during the term of its policy but no longer, and at all meetings of the members shall be entitled to one vote either in person or by proxy, provided, however, that where there is more than one insured under any policy, such insureds shall nevertheless be deemed to be a single member of the Corporation for all purposes.  The Corporation may issue policies which do not entitle the insured to membership in the Corporation nor to participate in its surplus.

SECTION 10.  Upon the termination of the membership of any member, all his or its right and interest in the surplus, reserves and other assets of the Corporation shall forthwith cease.

## EXTRACTS FROM THE BY-LAWS OF THIS COMPANY
### Adopted July 13, 2000

ARTICLE 1 - MEETINGS OF THE MEMBERS

SECTION 1.  Annual Meeting
The annual meeting of the members shall be held at the principal offices of the Company, or at such other place as may be stated in the notice of the meeting, at 9:00 a.m. on the second Thursday of April in each year, for the election of directors and the transaction of such other business as may be brought before the meeting.  If the annual meeting is omitted on the day herein provided therefor, a special meeting may be held in place thereof; and any business transacted or elections held at such special meeting shall be as effective as if transacted or held at the annual meeting.



Account No.  1-78868
Policy No.  LP581

## TABLE OF CONTENTS
### (Order In Which They Appear)

Page No.

**DECLARATIONS PAGE**

**DECLARATIONS - SECTION A**

1.  NAMED INSURED AND MAILING ADDRESS ................................................1
2.  POLICY DATES ................................................................................1
3.  TERRITORY ...................................................................................1
4.  INSURED LOCATION..........................................................................1
5.  CURRENCY......................................................................................2
6.  LIMITS OF LIABILITY .........................................................................2
7.  PREMIUM........................................................................................5
8.  PREMIUM PAYABLE ...........................................................................6
9.  VALUE REPORTING PROVISIONS ...........................................................6
10. WAITING PERIOD ..............................................................................6
11. DEDUCTIBLES ..................................................................................6

**PROPERTY DAMAGE - SECTION B**

1.  PROPERTY INSURED...........................................................................10
2.  PROPERTY EXCLUDED ........................................................................10
3.  ADDITIONAL COVERAGES....................................................................11
    A.  ACCOUNTS RECEIVABLE..............................................................11
    B.  AUTOMATIC COVERAGE ...............................................................12
    C.  BRANDS AND LABELS ...................................................................13
    D.  CONSEQUENTIAL REDUCTION IN VALUE.............................................13
    E.  CONTROL OF DAMAGED PROPERTY ..................................................13
    F.  DATA, PROGRAMS OR SOFTWARE.....................................................14
    G.  DEBRIS REMOVAL........................................................................15
    H.  DECONTAMINATION COSTS ............................................................15
    I.  DEFERRED PAYMENTS ...................................................................16
    J.  DEMOLITION AND INCREASED COST OF CONSTRUCTION .........................16
    K.  EARTH MOVEMENT.......................................................................17
    L.  ERRORS AND OMISSIONS ...............................................................18
    M.  EXPEDITING COSTS......................................................................18
    N.  FINE ARTS .................................................................................18
    O.  FLOOD.......................................................................................19
    P.  INTEREST IN NON-OWNED REAL PROPERTY .........................................19
    Q.  LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND
        DISPOSAL...................................................................................20
    R.  MISCELLANEOUS PERSONAL PROPERTY ..............................................20
    S.  OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION..................21
    T.  OPERATIONAL TESTING .................................................................21
    U.  PROFESSIONAL FEES .....................................................................22
    V.  PROTECTION AND PRESERVATION OF PROPERTY ...................................22
    W.  RELOCATION OF EMPLOYEES ..........................................................22
    X.  RESEARCH ANIMALS .....................................................................23



Account No.  1-78868
Policy No.  LP581

## TABLE OF CONTENTS
### (Order In Which They Appear)

Page No.

|  |  |  |  |
|---|---|---|---|
| Y. | SERVICE INTERRUPTION PROPERTY DAMAGE | ..... | 23 |
| Z. | TAX TREATMENT OF PROFITS | ..... | 24 |
| AA. | TEMPORARY REMOVAL OF PROPERTY | ..... | 25 |
| BB. | TERRORISM | ..... | 25 |
| CC. | TRANSPORTATION | ..... | 26 |
| DD. | VALUABLE PAPERS AND RECORDS | ..... | 28 |

4. APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ..... 28
5. EXCLUSIONS ..... 29

**TIME ELEMENT - SECTION C**

1. LOSS INSURED ..... 34
2. TIME ELEMENT COVERAGES ..... 35
   A. BUSINESS INTERRUPTION ..... 36
   B. EXTRA EXPENSE ..... 36
   C. LEASEHOLD INTEREST ..... 37
   D. RENTAL INSURANCE ..... 38
3. TIME ELEMENT COVERAGE EXTENSIONS – GROUP A ..... 38
   A. CIVIL AUTHORITY ..... 38
   B. DELAY IN START UP ..... 38
   C. DEPENDENT TIME ELEMENT ..... 39
   D. EXTENDED PERIOD OF LIABILITY ..... 40
   E. INGRESS/EGRESS ..... 41
   F. ON PREMISES SERVICES ..... 41
   G. SERVICE INTERRUPTION TIME ELEMENT ..... 42
4. TIME ELEMENT COVERAGE EXTENSIONS – GROUP B ..... 42
   A. COMPUTER SYSTEMS–NON PHYSICAL DAMAGE ..... 43
   B. PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT ..... 43
   C. RELATED REPORTED VALUES ..... 43
   D. RESEARCH AND DEVELOPMENT ..... 43
   E. SOFT COSTS ..... 44
5. PERIOD OF LIABILITY ..... 44
6. TIME ELEMENT EXCLUSIONS ..... 46

**LOSS ADJUSTMENT AND SETTLEMENT - SECTION D**

1. LOSS ADJUSTMENT/PAYABLE ..... 48
2. CURRENCY FOR LOSS PAYMENT ..... 48
3. VALUATION ..... 48
4. LOSS CONDITIONS ..... 51
   A. REQUIREMENTS IN CASE OF LOSS ..... 51
   B. COMPANY OPTION ..... 52
   C. ABANDONMENT ..... 52
   D. SUBROGATION ..... 52
   E. APPRAISAL ..... 52
   F. SUIT AGAINST THE COMPANY ..... 53
5. SETTLEMENT OF CLAIMS ..... 53

Printed 06-May-2005
BINA Rev. Jan. 2005



Account No.  1-78868
Policy No.  LP581

## TABLE OF CONTENTS
### (Order In Which They Appear)

Page No.

6.   COLLECTION FROM OTHERS..................................................................................54
7.   PARTIAL PAYMENT OF LOSS SETTLEMENT......................................................54

**GENERAL PROVISIONS - SECTION E**
1.   ADDITIONAL INSURABLE INTERESTS/CERTIFICATES OF INSURANCE ....................55
2.   CANCELLATION/NON-RENEWAL ...........................................................................55
3.   INSPECTIONS .......................................................................................................55
4.   PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS ...................................56
5.   LIBERALIZATION ..................................................................................................56
6.   MISREPRESENTATION AND FRAUD .....................................................................56
7.   LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS.................56
8.   OTHER INSURANCE ..............................................................................................58
9.   POLICY MODIFICATION ........................................................................................58
10.  REDUCTION BY LOSS ...........................................................................................59
11.  SUSPENSION ........................................................................................................59
12.  TITLES .................................................................................................................59
SCHEDULE OF LOCATIONS ......................................................................APPENDIX A
NEW MADRID AND PACIFIC NORTHWEST SEISMIC ZONES...................APPENDIX B
SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, FORM
FMG7215
SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT, FORM
FMG7182
SUPPLEMENTAL UNITED STATES NON CERTIFIED ACT OF TERRORISM ENDORSEMENT,
FORM FMG7183S
SUPPLEMENTAL UNITED STATES NON CERTIFIED ACT OF TERRORISM ENDORSEMENT,
FORM FMG7183



## DECLARATIONS - SECTION A

1. **NAMED INSURED AND MAILING ADDRESS**

   Howard Hughes Medical Institute and any subsidiary, and Howard Hughes Medical Institute's interest in any partnership or joint venture in which Howard Hughes Medical Institute has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured", including legal representatives.

   4000 Jones Bridge Road
   Chevy Chase, Maryland 20815

2. **POLICY DATES**

   | | |
   |---|---|
   | FROM: | 01-April-2005 |
   | TO: | 01-April-2006 |
   | TERM: | 01 Year |

3. **TERRITORY**

   This Policy covers Insured Locations in:

   A.    The United States of America.

4. **INSURED LOCATION**

   A.    The coverages under this Policy apply to an Insured Location unless otherwise provided.

   Insured Location is a location:

   1)    listed on a Schedule of Locations attached to this Policy.

   2)    covered as a Miscellaneous Unnamed Location.

   3)    covered under the terms and conditions of the Automatic Coverage or Errors and Omissions provisions.

   B.    References and Application. The following term(s) wherever used in this Policy means:

   1)    Miscellaneous Unnamed Location:  A Location owned, leased or rented by the Insured, but not specified in the Schedule of Locations.

   2)    Location:

   a)    as specified in the Schedule of Locations, or



b) if not so specified in the Schedule of Locations: a Location is a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing) bounded on all sides by public streets, clear land space or open waterways, each not less than fifty feet wide. Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this References and Application.

### 5.  CURRENCY

All amounts, including deductibles, premiums and limits of liability, indicated in this Policy shall be in the currency represented by the three letter currency designation shown.  This three letter currency designator is defined in Table A.1-Currency and funds code list, International Standards Organization (ISO) 4217, edition effective at inception of this Policy.

### 6.  LIMITS OF LIABILITY

The Company's maximum limit of liability in a single occurrence regardless of the number of Locations or coverages involved will not exceed the Policy limit of liability of USD500,000,000, except as follows.  When a limit of liability for a Location or other specified property is shown, such limit will be the maximum amount payable for any loss or damage arising from physical loss or damage at such Location or involving such other specified property.

Miscellaneous Unnamed Locations: USD10,000,000 per Location but not to exceed the following:

Personal Property of the Insured's
Officers, employees and guests:          USD10,000 in the Aggregate During Any
                                          Policy Year but not to exceed USD2,500 per
                                          occurrence

If a lesser limit of liability is stated below or elsewhere in this Policy, the lesser limit will apply. The limits of liability stated below or elsewhere in this Policy are part of and not in addition to the Policy limit of liability.

Limits of liability stated below apply in the aggregate per occurrence for all Locations and coverages involved.

When a limit of liability is shown as applying in the Aggregate During Any Policy Year, the Company's maximum limit of liability will not exceed such limit during any policy year regardless of the number of locations, coverages or occurrences involved.

In the event an occurrence results in liability payable under more than one policy issued to the Named Insured by the Company, or its representative companies, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy regardless of the number of coverages, locations or perils involved.

 **FM** Global

Account No.  1-78868
Policy No.  LP581

Limits of Liability

USD25,000,000 applies to each of the following:

ACCOUNTS RECEIVABLE;
DATA, PROGRAMS OR SOFTWARE and COMPUTER SYSTEMS – NON PHYSICAL DAMAGE combined;
DEFERRED PAYMENTS;
DEPENDENT TIME ELEMENT, but not to exceed a USD10,000,000 limit per DEPENDENT TIME ELEMENT location;
ERRORS AND OMISSIONS;
EXPEDITING COSTS and EXTRA EXPENSE combined;
FINE ARTS;
SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined as respects all specified services interrupted but not to exceed a USD5,000,000 limit combined for voice, data or video service;
TRANSPORTATION;
VALUABLE PAPERS AND RECORDS

USD10,000,000 applies to each of the following:

MISCELLANEOUS PERSONAL PROPERTY per Location;
OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION;
SOFT COSTS;

USD100,000,000:

EARTH MOVEMENT in the Aggregate During Any Policy Year but not to exceed the following limits in the Aggregate During Any Policy Year:

USD10,000,000 for property located in High Hazard Zones for Earth Movement

USD100,000,000:

FLOOD

USD40,000,000:

INTEREST IN NON-OWNED REAL PROPERTY located at 1182, 1188, 1204, 1240 York Avenue, 220-222 East 70th Street, New York, NY, 10021, but not to exceed USD25,000,000 for INTEREST IN NON-OWNED REAL PROPERTY at all other locations

USD5,000,000:

RESEARCH ANIMALS in the Aggregate During Any Policy Year

USD750,000:

RELOCATION OF EMPLOYEES

USD50,000:

LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL in the Aggregate During Any Policy Year

Printed 06-May-2005
BINA Rev. Jan. 2005

FM Global

Account No.  1-78868
Policy No.   LP581

USD100,000:

USD250,000,000:

PROFESSIONAL FEES

TERRORISM and NON CERTIFIED ACT OF TERRORISM combined in the Aggregate During Any Policy Year, but not to exceed the following limit(s) in the Aggregate During Any Policy Year:

USD250,000,000 for property located at 19700, 19710 and 19746 Janelia Farm Boulevard, Ashburn, Virginia for Property Damage and Time Element combined

USD100,000,000 for property located at 4000 Jones Bridge Road, Chevy Chase, Maryland for Property Damage and Time Element combined

USD25,000,000 for all other Locations listed on a Schedule of Locations, Appendix A, attached to this Policy

USD1,000,000 for Miscellaneous Unnamed Locations, MISCELLANEOUS PERSONAL PROPERTY, OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION and TEMPORARY REMOVAL OF PROPERTY combined for Property Damage and Time Element combined

USD1,000,000 for Flood Property Damage and Time Element combined when caused by or resulting from Terrorism and Non Certified Act of Terrorism combined

These limits shall not include the Actual Cash Value portion of fire damage caused by Terrorism

These limits do not apply to Certified Act of Terrorism as described in the SUPPLEMENTAL UNITED STATES CERTIFIED ACT OF TERRORISM ENDORSEMENT

Upon the expiration of the Terrorism Risk Insurance Act of 2002, the above Limits of Liability for TERRORISM and NON CERTIFIED ACT OF TERRORISM will be considered null and void and replaced with the Limits of Liability for TERRORISM shown below:

**FM** Global

Account No.  1-78868
Policy No.  LP581

USD25,000,000:     TERRORISM for property located in the United States (except the state of New York), its territories and possessions for Property Damage and Time Element combined except USD100,000,000 for property located at 4000 Jones Bridge Road, Chevy Chase, Maryland and 19700, 19710 and 19746 Janelia Farm Boulevard, Ashburn, Virginia for Property Damage and Time Element combined, but not to exceed the following limit(s) in the Aggregate During Any Policy Year:

USD1,000,000 for Miscellaneous Unnamed Locations, MISCELLANEOUS PERSONAL PROPERTY, OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION and TEMPORARY REMOVAL OF PROPERTY combined for Property Damage and Time Element combined

USD1,000,000 for Flood Property Damage and Time Element combined when caused by or resulting from Terrorism

These limits shall not include the Actual Cash Value portion of fire damage caused by Terrorism

<u>Time Limits</u>

In addition to the time limits shown elsewhere in this Policy, the following apply:

90 day period but not to exceed a USD100,000,000 limit:     AUTOMATIC COVERAGE

30 day period:     EXTENDED PERIOD OF LIABILITY

30 day period but not to exceed a USD25,000,000 limit:     INGRESS/EGRESS

12 month period:     TIME ELEMENT loss as respects TERRORISM and NON CERTIFIED ACT OF TERRORISM combined

This Time Limit for TERRORISM coverage and NON CERTIFIED ACT OF TERRORISM shall not be considered additive to any other Time Limits or to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section, and shall be subject to the limit of liability for TERRORISM and NON CERTIFIED ACT OF TERRORISM.

7.     **PREMIUM**

This Policy is issued in consideration of an initial premium.  If the term of this Policy is longer than one year, for each subsequent year of coverage, premium will be due at the anniversary and will be subject to rules and rates in effect at that time.



Account No.  1-78868
Policy No.  LP581

## 8.  PREMIUM PAYABLE

Howard Hughes Medical Institute pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of Howard Hughes Medical Institute.

## 9.  VALUE REPORTING PROVISIONS

The Insured will provide the Company 100% values by location.

These statement(s) of values are due on the date(s) shown below.

| Values as Of | Due Date | Type of Values |
|---|---|---|
| 01-April | 01-April | Property values in accordance with the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section. |
| 01-April | 01-April | In addition, Stock and Supplies on the average and maximum values based on the previous 12 month period. |
| 01-April | 01-April | Time Element values anticipated for the 12 months following the "Value as Of" date, and the actual Time Element values for the previous 12 month period. |

## 10.  WAITING PERIOD

For the purposes of applying COMPUTER SYSTEMS-NON PHYSICAL DAMAGE Coverage, the Waiting Period is 48 hours.

For the purposes of applying DATA, PROGRAMS OR SOFTWARE Coverage when the loss or damage is caused by the malicious introduction of a machine code or instruction, the Waiting Period is 48 hours.

For the purposes of applying SERVICE INTERRUPTION Coverage, the Waiting Period is 12 hours.

## 11.  DEDUCTIBLES

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible specified below, and only for its share of that greater amount.

Unless otherwise stated below:

A.   When this Policy insures more than one location, the deductible will apply against the total loss covered by this Policy in any one occurrence.

B.   If two or more deductibles provided in this Policy apply to a single occurrence, the total to be deducted will not exceed the largest deductible applicable, unless otherwise provided.



Policy Deductible(s)

USD25,000 combined all coverages, except as follows.

Exceptions to Policy Deductible(s)

Computer Systems-Non Physical Damage

2 Day Equivalent deductible subject to a minimum deductible of USD250,000, combined all coverages.

Data, Programs or Software

2 Day Equivalent deductible as respects loss or damage caused by the malicious introduction of a machine code or instruction, subject to a minimum deductible of USD250,000, combined all coverages.

Earthquake

As respects Locations in California, the following deductibles apply to earthquake losses and will apply separately at each Location irrespective of any other deductibles applying:

A.    5% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured (including foundations) at the Location where the physical damage occurred - Property Damage

B.    5% of the full 12 months Time Element values that would have been earned in the 12 month period following the occurrence by use of the facilities at the Location where the physical damage occurred and all other Locations where TIME ELEMENT loss ensues - Time Element

C.    The above deductibles are subject to a minimum deductible of USD25,000 per Location, combined all coverages.

As respects Locations in the New Madrid Seismic Zone, Group A Listing as described in Appendix B, the following deductibles apply to earthquake losses and will apply separately at each Location irrespective of any other deductibles applying:

A.    1% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured (including foundations) at the Location where the physical damage occurred - Property Damage

B.    1% of the full 12 months Time Element values that would have been earned in the 12 month period following the occurrence by use of the facilities at the Location where the physical damage occurred and all other Locations where TIME ELEMENT loss ensues - Time Element



C.   The above deductibles are subject to a minimum deductible of USD100,000 per Location, combined all coverages.

As respects Locations in the New Madrid Seismic Zone, Group B Listing as described in Appendix B, the following deductibles apply to earthquake losses and will apply separately at each Location irrespective of any other deductibles applying:

A.   5% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured (including foundations) at the Location where the physical damage occurred - Property Damage

B.   5% of the full 12 months Time Element values that would have been earned in the 12 month period following the occurrence by use of the facilities at the Location where the physical damage occurred and all other Locations where TIME ELEMENT loss ensues - Time Element

C.   The above deductibles are subject to a minimum deductible of USD250,000 per Location, combined all coverages.

As respects Locations in the Pacific Northwest Seismic Zone as described in Appendix B, the following deductibles apply to earthquake losses and will apply separately at each Location irrespective of any other deductibles applying:

A.   2% of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured (including foundations) at the Location where the physical damage occurred - Property Damage

B.   2% of the full 12 months Time Element values that would have been earned in the 12 month period following the occurrence by use of the facilities at the Location where the physical damage occurred and all other Locations where TIME ELEMENT loss ensues - Time Element

C.   The above deductibles are subject to a minimum deductible of USD100,000 per Location, combined all coverages.

<u>Flood</u>

USD500,000 combined all coverages

<u>Personal Property of the Insured's officers, employees and guests</u>

USD1,000 combined all coverages

<u>Relocation of Employees</u>

USD1,000 combined all coverages



Transportation

USD1,000 combined all coverages

2002 John Deere Tractor located at Location 66. "Janelia Farm". Ashburn, Virginia

USD5,000 combined all coverages

Terrorism coverage and the Actual Cash Value portion of fire damage caused by Terrorism

As respects Locations in the United States, its territories and possessions and the Commonwealth of Puerto Rico upon the expiration of the Terrorism Risk Insurance Act of 2002, the following deductible shall apply:

As respects Locations in the United States (except the state of New York), its territories and possessions and the Commonwealth of Puerto Rico, the following deductible(s) applies to Terrorism coverage losses and to the Actual Cash Value portion of the fire damage caused by or resulting from Terrorism irrespective of any other deductibles applying:

The greater of the Policy Deductible, or

A.     1 % of the value, per the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section, of the property insured (including foundations) at the Location where the physical damage occurred, per Location - Property Damage

B.     1% of the full 12 months Time Element values that would have been earned in the 12 month period following the occurrence by use of the facilities at the Location where the physical damage occurred and all other Locations where TIME ELEMENT loss ensues, per Location - Time Element

C.     The above deductibles, items A and B, are subject to a maximum deductible of USD1,000,000 per occurrence combined all coverages.

References and Application.  The following term(s) wherever used in this Policy means:

Day Equivalent:

An amount equivalent to the number of days stated times the 100% daily Time Element value that would have been earned following the occurrence at the Location where the physical damage occurred and all other Locations where TIME ELEMENT loss ensues.

Printed 06-May-2005
BINA Rev. Jan. 2005



Account No.  1-78868
Policy No.   LP581

## PROPERTY DAMAGE - SECTION B

1.  **PROPERTY INSURED**

This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, located at an Insured Location or within 1,000 feet thereof, to the extent of the interest of the Insured in such property.

A.  Real Property, including new buildings and additions under construction at an Insured Location, in which the Insured has an insurable interest.

B.  Personal Property:

    1)  owned by the Insured.

    2)  consisting of the Insured's interest as a tenant in improvements and betterments.  In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

    3)  of officers and employees of the Insured.

    4)  of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

    5)  of others in the Insured's custody to the extent of the Insured's legal liability for physical loss or damage to Personal Property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

This Policy also insures the interest of contractors and subcontractors in insured property during construction at an Insured Location or within 1,000 feet thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

2.  **PROPERTY EXCLUDED**

This Policy excludes:

A.  currency, money, precious metal in bullion form, notes, or securities.

B.  land, water or any other substance in or on land; except this exclusion does not apply to:

    1)  land improvements consisting of landscape gardening, roadways and pavements, but not including any fill or land beneath such property.



2) water that is contained within any enclosed tank, piping system or any other processing equipment.

C.  animals except as provided by the RESEARCH ANIMALS coverage of this policy, standing timber, growing crops.

D.  watercraft or aircraft, except when unfueled and manufactured by the Insured.

E.  vehicles of officers and employees of the Insured or vehicles otherwise insured for physical loss or damage.

F.  underground mines or mine shafts or any property within such mine or shaft.

G.  dams and dikes.

H.  property in transit, except as otherwise provided by this Policy.

I.  property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the DEFERRED PAYMENTS coverage of this Policy.

J.  electronic data, programs and software, except when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured or as otherwise provided by the DATA, PROGRAMS OR SOFTWARE coverage of this Policy.

3.  **ADDITIONAL COVERAGES**

This Policy includes the following Additional Coverages for physical loss or damage insured by this Policy.

These Additional Coverages:

1)  are subject to the applicable limit of liability;

2)  will not increase the Policy limit of liability; and

3)  are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

A.  **ACCOUNTS RECEIVABLE**

This Policy covers any shortage in the collection of accounts receivable, resulting from insured physical loss or damage to accounts receivable records, including accounts receivable records stored as electronic data, while anywhere within this Policy's TERRITORY, including while in transit. The Company will be liable for the interest charges on any loan to offset impaired collections pending repayment of such sum uncollectible as the result of such loss or damage. Unearned interest and service charges on



deferred payment accounts and normal credit losses on bad debts will be deducted in determining the recovery.

1) In the event of loss to accounts receivable records, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2) The Insured agrees to use any suitable property or service:

    a) owned or controlled by the Insured; or

    b) obtainable from other sources,

in reducing the loss under this Additional Coverage.

3) This Policy covers any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

4) If it is possible to reconstruct accounts receivable records so that no shortage is sustained, the Company will be liable only for the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct such records, and not for any costs covered by any other insurance.

5) ACCOUNTS RECEIVABLE Exclusions:  The following exclusions are in addition to the EXCLUSIONS clause of this section:

This Additional Coverage does not insure against shortage resulting from:

    a) bookkeeping, accounting or billing errors or omissions; or

    b) (i) alteration, falsification, manipulation; or

       (ii) concealment, destruction or disposal,

    of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

6) The settlement of loss will be made within 90 days from the date of physical loss or damage.  All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company.  All recoveries exceeding the amount paid will belong to the Insured.

**B.    AUTOMATIC COVERAGE**

This Policy covers insured property at any Location purchased, leased or rented by the Insured after the inception date of this Policy.  This coverage applies from the date of purchase, lease or rental.



This Additional Coverage does not apply to property insured in whole or in part by any other insurance policy.

This coverage will apply until whichever of the following occurs first:

1)  The Location is bound by the Company.

2)  Agreement is reached that the Location will not be insured under this Policy.

3)  The Time Limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached. The Time Limit begins on the date of purchase, lease or rental.

**C.  BRANDS AND LABELS**

If branded or labeled property insured by this Policy is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

1)  stamp "salvage" on the property or its containers; or

2)  remove or obliterate the brands or labels,

if doing so will not damage the property. In either event, the Insured must relabel such property or its containers to be in compliance with any applicable law.

**D.  CONSEQUENTIAL REDUCTION IN VALUE**

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from physical loss or damage insured by this Policy to other insured parts of pairs, sets or components of such merchandise. If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

**E.  CONTROL OF DAMAGED PROPERTY**

This Policy gives control of physically damaged property consisting of finished goods manufactured by or for the Insured as follows:

1)  The Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2)  The Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3)  Property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.



4)  Any salvage proceeds received will go to the:

    a)  Company at the time of loss settlement; or

    b)  Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

**F.    DATA, PROGRAMS OR SOFTWARE**

This Policy covers insured Physical Loss Or Damage To Electronic Data, Programs Or Software, including physical loss or damage caused by the malicious introduction of a machine code or instruction, while anywhere within this Policy's TERRITORY, including while in transit.

1)  With respect to Physical Loss Or Damage caused by the malicious introduction of machine code or instruction, this Additional Coverage will apply when the Period of Liability is in excess of the time shown as Waiting Period in the WAITING PERIOD clause of the DECLARATIONS section.

2)  This Additional Coverage also covers the cost of the following reasonable and necessary actions taken by the Insured:

    a)  Actions to temporarily protect and preserve insured electronic data, programs or software;

    b)  Actions taken for the temporary repair of insured Physical Loss Or Damage To Electronic Data, Programs Or Software and to expedite the permanent repair or replacement of such damaged property,

    provided such actions are taken due to actual insured Physical Loss Or Damage To Electronic Data, Programs Or Software.

3)  This Additional Coverage also covers the reasonable and necessary costs incurred by the Insured to temporarily protect or preserve insured electronic data, programs or software against immediately impending insured Physical Loss Or Damage To Electronic Data, Programs Or Software.  In the event that the physical loss or damage does not occur, the costs covered under this item 3 will be subject to the deductible that would have applied if the physical loss or damage had occurred.

4)  Costs recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

5)  This Additional Coverage excludes loss or damage to data, programs or software when they are stock in process, finished goods manufactured by the Insured, raw materials, supplies or other merchandise not manufactured by the Insured.

6)  DATA, PROGRAMS OR SOFTWARE Exclusions:  The exclusions in the EXCLUSIONS clause of this section do not apply to DATA, PROGRAMS OR



SOFTWARE except for A1, A2, A6, B1, B2, B3a, B4 and B5.  In addition as respects DATA, PROGRAMS OR SOFTWARE the following exclusions apply:

This Policy does not insure:

a) errors or omissions in processing, or copying; all unless physical damage not excluded by this Policy results, in which event, only that resulting damage is insured.

b) loss or damage to data, programs or software from errors or omissions in programming or machine instructions; all unless physical damage not excluded by this Policy results, in which event, only that resulting damage is insured.

c) deterioration, inherent vice, vermin or wear and tear; all unless physical damage not excluded by this Policy results, in which event, only that resulting damage is insured.

7) References and Application.  The following term(s) means:

a) Physical Loss Or Damage To Electronic Data, Programs Or Software:

The destruction, distortion or corruption of electronic data, programs or software.

## G.   DEBRIS REMOVAL

This Policy covers the reasonable and necessary costs incurred to remove debris from an Insured Location that remains as a direct result of physical loss or damage insured by this Policy.

This Additional Coverage does not cover the costs of removal of:

1) contaminated uninsured property; or

2) the contaminant in or on uninsured property,

whether or not the contamination results from insured physical loss or damage. Contamination includes, but is not limited to, the presence of pollution or hazardous material.

## H.   DECONTAMINATION COSTS

If insured property is contaminated as a direct result of physical damage insured by this Policy and there is in force at the time of the loss any law or ordinance regulating contamination, including but not limited to the presence of pollution or hazardous material, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated as a direct result of insured physical damage.



The Company is not liable for the costs required for removing contaminated uninsured property nor the contaminant therein or thereon, whether or not the contamination results from an insured event.

## I.    DEFERRED PAYMENTS

This Policy covers insured physical loss or damage to Personal Property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)  pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)  from theft or conversion by the buyer of the property after the buyer has taken possession of such property.

3)  to the extent the buyer continues payments.

4)  not within the TERRITORY of this Policy.

## J.    DEMOLITION AND INCREASED COST OF CONSTRUCTION

1)  This Policy covers the reasonable and necessary costs incurred, described in item 3 below, to satisfy the minimum requirements of the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of buildings or structures at an Insured Location, provided:

a)  such law or ordinance is in force on the date of insured physical loss or damage; and

b)  its enforcement is a direct result of such insured physical loss or damage.

2)  This Additional Coverage does not cover loss due to any law or ordinance with which the Insured was required to comply had the loss not occurred.

3)  This Additional Coverage, as respects the property insured in item 1 above, covers:

a)  the cost to repair or rebuild the physically damaged portion of such property with materials and in a manner to satisfy such law or ordinance; and

b)  the cost:

(i)  to demolish the physically undamaged portion of such property insured; and

Page 16



(ii) to rebuild it with materials and in a manner to satisfy such law or ordinance,

to the extent that such costs result when the demolition of the physically damaged insured property is required to satisfy such law or ordinance.

4) This Additional Coverage excludes any costs incurred as a direct or indirect result of enforcement of any laws or ordinances regulating any form of contamination including but not limited to the presence of pollution or hazardous material.

5) The Company's maximum liability for this Additional Coverage at each Insured Location in any occurrence will not exceed the actual cost incurred in demolishing the physically undamaged portion of the property insured in item 1 above plus the lesser of:

a) the reasonable and necessary actual cost incurred, excluding the cost of land, in rebuilding on another site; or

b) the cost of rebuilding on the same site.

## K.  EARTH MOVEMENT

This Policy covers physical loss or damage caused by or resulting from Earth Movement.

This Additional Coverage does not apply to loss or damage caused by or resulting from flood; surface waters; rising waters; waves; tide or tidal water; the release of water; the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; or sewer back-up resulting from any of the foregoing; all regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

1) References and Application. The following term(s) wherever used in this Policy means:

a) Earth Movement:

Any natural or man-made earth movement including, but not limited to earthquake or landslide, regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical damage by fire, explosion, or sprinkler leakage resulting from Earth Movement will not be considered to be loss by Earth Movement within the terms and conditions of this Policy. All earth movements within a continuous 72 hour period will be considered a single Earth Movement.

b) High Hazard Zones for Earth Movement:

Property located in California, Hawaii, Alaska and in the New Madrid and Pacific Northwest Seismic Zones as described in Appendix B.



**L.    ERRORS AND OMISSIONS**

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1)  in the description of where insured property is physically located;

2)  to include any Location:

   a)  owned, leased or rented by the Insured on the effective date of this Policy; or

   b)  purchased, leased or rented by the Insured during the term of this Policy; or

3)  that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

**M.    EXPEDITING COSTS**

This Policy covers the reasonable and necessary costs incurred to pay for the temporary repair of insured damage to insured property and to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs:

1)  recoverable elsewhere in this Policy; or

2)  of permanent repair or replacement of damaged property.

**N.    FINE ARTS**

This Policy covers insured physical loss or damage to Fine Arts articles while anywhere within this Policy's TERRITORY, including while in transit.

1)  This Additional Coverage excludes loss or damage if the Fine Arts cannot be replaced with other of like kind and quality, unless it is specifically declared to the Company.

2)  FINE ARTS Exclusion: The exclusions in the EXCLUSIONS clause of this section do not apply to FINE ARTS coverage except for A1, A2, A6, A7, B1, B2, B3a, B4, B5 and D4.  In addition, as respects FINE ARTS, the following exclusions apply:

This Policy does not insure against:

   a)  deterioration, wear and tear or inherent vice.



b) loss or damage from any repairing, restoration or retouching process.

3) References and Application. The following term(s) wherever used in this Policy means:

a) Fine Arts:

Paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

## O.   FLOOD

This Policy covers physical loss or damage caused by or resulting from Flood.

1) References and Application. The following term(s) wherever used in this Policy means:

a) Flood:

Flood; surface waters; rising waters; waves; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom; or sewer back-up resulting from any of the foregoing; regardless of any other cause or event contributing concurrently or in any other sequence of loss. However, physical damage by fire, explosion or sprinkler leakage resulting from Flood is not considered to be loss by Flood within the terms and conditions of this Policy.

## P.   INTEREST IN NON-OWNED REAL PROPERTY

This Policy covers the Insured's interest in non-owned Real Property at locations per schedule on file with this Company directly resulting from physical loss or damage of the type insured against by this Policy, where no other insurance coverage exists. The Insured's interest is defined as the value of their contribution to the host institution as described in lease or collaboration agreements between the Insured and these various host institutions.

If as a result of an error or unintentional omission, property insurance coverage protecting the Insured's interest is non-existent, invalid, insufficient in amount or uncollectible, this Policy will cover the cost to repair, rebuild or replace the damaged property, not to be limited by the Insured's interest as defined above.

No person or organization, other than the Named Insured, may benefit from or make claim under this coverage. This coverage is subject to all Terms and Conditions of this Policy and does not increase any other limit (s) under this Policy.

INTEREST IN NON-OWNED REAL PROPERTY Exclusion: The following additional exclusion applies:

Printed 06-May-2005
BINA Rev. Jan. 2005



Account No.  1-78868
Policy No.  LP581

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a) Earth Movement for property located in California.

b) Flood

**Q.  LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL**

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of contaminants or pollutants from uninsured property consisting of land, water or any other substance in or on land at the Insured Location if the release, discharge or dispersal of contaminants or pollutants is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of contaminants or pollutants from such property:

1) at any location insured for Personal Property only.

2) at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or Miscellaneous Unnamed Location coverage provided by this Policy.

3) when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

**R.  MISCELLANEOUS PERSONAL PROPERTY**

This Policy covers insured physical loss or damage to Personal Property of the type insured:

1) owned by the Insured or

2) property of others in the custody of the Insured, to the extent the Insured is under obligation to keep insured for physical loss or damage, not otherwise excluded from this Policy,

at any Location within the TERRITORY of this Policy.

This Additional Coverage excludes property insured under any other coverage in this Policy.

MISCELLANEOUS PERSONAL PROPERTY Exclusion:  The following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

FM Global

a)  Earth Movement for property located in High Hazard Zones for Earth Movement.

**S.   OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION**

This Policy covers insured physical loss or damage to property of the type insured that is under contract to be used in a construction project at an Insured Location.

Coverage attaches at the time such property is delivered to the Insured or their contractor (with respect to the property under construction) by the manufacturer or supplier and such property is located at a storage site within this Policy's TERRITORY but away from the Insured Location.

This coverage includes necessary expendable materials and supplies to be utilized in the construction project but does not include any property owned or rented by the contractor.

OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION Exclusion: The following additional exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a)  Earth Movement for property located in High Hazard Zones for Earth Movement.

**T.   OPERATIONAL TESTING**

This Policy covers insured physical loss or damage to insured property during the Period Of Operational Testing.

Property, including stock or material, manufactured or processed by the Insured is excluded under this Additional Coverage.

1)  References and Application: The following term(s) means:

a)  Period Of Operational Testing:

The period of time beginning 24 hours prior to the earlier of the following:

(i)  introduction, into a system, of feedstock or other materials for processing or handling;

(ii)  commencement of fuel or energy supply to a system,

and ending with the earlier of the following:

(i)  the expiration date or cancellation date of this Policy.

(ii)  if specified, the number of consecutive days shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.



**U.  PROFESSIONAL FEES**

This Policy covers the actual costs incurred by the Insured, of reasonable fees payable to the Insured's accountants, architects, auditors, engineers, or other professionals and the cost of using the Insured's employees, for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

1)  This Additional Coverage will not include the fees and costs of attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them nor the fees and costs of loss consultants who provide consultation on coverage or negotiate claims.

2)  This Additional Coverage is subject to the deductible that applies to the loss.

**V.  PROTECTION AND PRESERVATION OF PROPERTY**

This Policy covers:

1)  reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2)  reasonable and necessary:

a)  fire department fire fighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

b)  costs incurred of restoring and recharging fire protection systems following an insured loss.

c)  costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage does not cover costs incurred for actions to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in this section of the Policy.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

**W.  RELOCATION OF EMPLOYEES**

This Policy covers insured physical loss or damage to Employee Goods of employees of the Insured transferred at the Insured's request and for which the Insured has assumed liability, while any where within the TERRITORY provisions of this Policy including while in transit.



Property insured under this coverage is excluded from property insured elsewhere in this policy.

RELOCATION OF EMPLOYEES Exclusion: As respects RELOCATION OF EMPLOYEES, the following additional exclusion applies:

This Policy excludes:

a) Earth Movement for property located in High Hazard Zones for Earth Movement

References and Application: The following term(s) means:

Employee Goods:

personal effects and property usual to use in households or in the use or maintenance of a dwelling.

## X.    RESEARCH ANIMALS

This Policy covers insured physical loss or damage to animals used for research.

RESEARCH ANIMALS Exclusions:  As respects RESEARCH ANIMALS, item C6 in the EXCLUSIONS clause of this section does not apply. · In addition, as respects RESEARCH ANIMALS, the following exclusion applies:

This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

a)  death, destruction, or injury from natural causes.

b)  escape.

c)  sickness, disease, infection, infestation or illness.

d)  error or omission in processing and/or failure on the part of the Insured to provide nourishment, medicine or sanitary conditions.

e)  contamination of animals, food or medicine.

## Y.    SERVICE INTERRUPTION PROPERTY DAMAGE

1)  This Policy covers insured physical loss or damage to insured property at an Insured Location or as MISCELLANEOUS PERSONAL PROPERTY when such physical loss or damage results from the interruption of the specified incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service or from the lack of incoming or outgoing voice, data or video service all by reason of any accidental occurrence to the facilities of the supplier of such service



Account No.  1-78868
Policy No.  LP581

located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

2) This Additional Coverage will apply when the Period of Service Interruption is in excess of the time shown as Waiting Period in the WAITING PERIOD clause of the DECLARATIONS section.

3) The exclusions in the EXCLUSIONS clause of this section do not apply to SERVICE INTERRUPTION PROPERTY DAMAGE coverage except for A1, A2, A3, A6, B1, B2 and D1. In addition, as respects SERVICE INTERRUPTION PROPERTY DAMAGE coverage the following exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a) Earth Movement for property located in High Hazard Zones for Earth Movement.

b) Terrorism.

c) the interruption of useable voice, data or video service as a result of an accidental occurrence or physical damage to a satellite.

4) Additional General Provisions:

a) The Insured will immediately notify the suppliers of services of any interruption of such services.

b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

5) References and Application. The following term(s) means:

a) Period of Service Interruption:

The period starting with the time when an interruption of specified services occurs; and ending when with due diligence and dispatch the service could be wholly restored.

## Z.  TAX TREATMENT OF PROFITS

This Policy is extended to cover the increased tax liability from an insured loss at an Insured Location if the tax treatment of:

1) the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or

2) the profit portion of a TIME ELEMENT loss payment under this Policy;



Account No.  1-78868
Policy No.  LP581

is greater than the tax treatment of profits that would have been incurred had no loss occurred.

## AA.  TEMPORARY REMOVAL OF PROPERTY

1) When insured property is removed from an Insured Location for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

   a) while at the location to which such property has been moved; and

   b) for physical loss or damage as provided at the Insured Location from which such property was removed.

2) This Additional Coverage does not apply to property:

   a) insured, in whole or in part, elsewhere in this Policy.

   b) insured, in whole or in part, by any other insurance policy.

   c) removed for normal storage, processing or preparation for sale or delivery.

## BB.  TERRORISM

This Policy covers physical loss or damage caused by or resulting from Terrorism only at locations as specifically described on the Schedule of Locations, at Miscellaneous Unnamed Locations and property covered under MISCELLANEOUS PERSONAL PROPERTY and OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION.

Any act which satisfies the definition of Terrorism in item B2f of the EXCLUSIONS clause in this section of the Policy shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

Amounts recoverable under this Additional Coverage are excluded from coverage elsewhere in this Policy.

This Additional Coverage does not cover loss or damage which also comes within the terms of item B2a of the EXCLUSIONS clause in this section of the Policy.

This Additional Coverage does not in any event cover loss or damage directly or indirectly caused by or resulting from any of the following, regardless of any other cause or event, whether or not insured under this Policy contributing concurrently or in any other sequence to the loss:

1) that involves the use, release or escape of nuclear materials, or that directly or indirectly results in nuclear reaction or radiation or radioactive contamination; or

Printed 06-May-2005
BINA Rev. Jan. 2005



2) that is carried out by means of the dispersal or application of pathogenic or poisonous biological or chemical materials; or

3) in which pathogenic or poisonous biological or chemical materials are released, and it appears that one purpose of the terrorism was to release such materials; or

4) that involves action taken to prevent, defend against, respond to or retaliate against Terrorism or suspected Terrorism.

As respects this Additional Coverage, this Policy does not insure any TIME ELEMENT loss as provided in the TIME ELEMENT section of this Policy for more than the number of months shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

## CC. TRANSPORTATION

1) This Policy covers the following Personal Property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

   a) owned by the Insured.

   b) shipped to customers under F.O.B., C & F or similar terms. The Insured's contingent interest in such shipments is admitted.

   c) of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

   d) of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery.

2) This Additional Coverage excludes:

   a) samples in the custody of salespeople or selling agents.

   b) property insured under import or export ocean marine insurance.

   c) waterborne shipments, unless:

      (i) by inland water; or

      (ii) by coastal shipments.

   d) waterborne shipments via Panama Canal or to and from Alaska, the Commonwealth of Puerto Rico, and Hawaii.

   e) airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

FM Global

    f)  property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

    g)  any transporting vehicle.

  3)  Coverage Attachment and Duration:

    a)  This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.

    b)  However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

  4)  This Additional Coverage:

    a)  covers general average and salvage charges on shipments covered while waterborne.

    b)  insures physical loss or damage caused by or resulting from:

        (i)  unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

        (ii)  improper parties having gained possession of property through fraud or deceit.

  5)  The exclusions in the EXCLUSIONS clause of this section do not apply to TRANSPORTATION coverage except for A1 through A4, B1 through B5, C1, C3, C5, C6, D1 through D4.

  6)  Additional General Provisions:

    a)  This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

    b)  The Insured has permission, without prejudicing this insurance, to accept:

        (i)  ordinary bills of lading used by carriers;

        (ii)  released bills of lading;

        (iii) undervalued bills of lading; and

        (iv)  shipping or messenger receipts.

    c)  The Insured may waive subrogation against railroads under side track agreements.

Printed 06-May-2005
BINA Rev. Jan. 2005



Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

## DD.  VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to Valuable Papers and Records while anywhere within this Policy's TERRITORY, including while in transit.

1)  This Additional Coverage excludes loss or damage to:

    a)  property described below, if such property cannot be replaced with other of like kind and quality, unless specifically declared to the Company.

    b)  currency, money or securities.

    c)  property held as samples or for sale or for delivery after sale.

2)  VALUABLE PAPERS AND RECORDS Exclusions: The exclusions in the EXCLUSIONS clause of this section do not apply to VALUABLE PAPERS AND RECORDS coverage except for A1, A2, A6, A7, B1, B2, B3a, B4, B5 and D4. In addition, as respects VALUABLE PAPERS AND RECORDS the following exclusions apply:

This Policy does not insure:

    a)  errors or omissions in processing, or copying; all unless physical damage not excluded by this Policy results, in which event, only that resulting damage is insured.

    b)  deterioration, inherent vice, vermin or wear and tear; all unless physical damage not excluded by this Policy results, in which event, only that resulting damage is insured.

3)  References and Application.  The following term(s) wherever used in this Policy means:

    a)  Valuable Papers and Records:

        Written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

## 4.  APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

A.  With respect to situations caused by the so-called "Year 2000" problem or any other Date or Time Recognition problem by Electronic Data Processing Equipment or Media, this Policy applies as follows.

1)  This Policy does not pay for remediation, change, correction, repair or assessment of any Year 2000 or any other Date or Time Recognition problem in any Electronic Data



Processing Equipment or Media, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property. This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

2)  Failure of Electronic Data Processing Equipment or Media to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not physical loss or damage insured against by this Policy. This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of Electronic Data Processing Equipment or Media to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000. Such covered resulting physical loss or damage does not include any loss, cost or expense described in 1 or 2 above. If such covered resulting physical loss or damage occurs, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.

B.  References and Application.  The following term(s) wherever used in this Policy means:

1)  Date or Time Recognition:

The recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

2)  Electronic Data Processing Equipment or Media:

Any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

5.  **EXCLUSIONS**

The following exclusions apply unless specifically stated elsewhere in this Policy:

A.  This Policy excludes:

1)  indirect or remote loss or damage.

2)  interruption of business, except to the extent provided by this Policy.

3)  loss of market or loss of use.



4) loss or damage or deterioration arising from any delay.

5) mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

6) loss from enforcement of any law or ordinance:

   a) regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

   b) requiring the demolition of any property, including the cost in removing its debris;

except as provided by the DECONTAMINATION COSTS and DEMOLITION AND INCREASED COST OF CONSTRUCTION coverages of this section of this Policy.

7) loss resulting from the voluntary parting with title or possession of property if induced by any fraudulent act or by false pretense.

B.    This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) nuclear reaction or nuclear radiation or radioactive contamination. However:

   a) if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

   b) this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the Insured Location, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the Insured Location. This coverage does not apply to any act, loss or damage excluded in item B2f of this EXCLUSIONS clause.

2) a) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

     (i) government or sovereign power (de jure or de facto);

     (ii) military, naval or air force; or

     (iii) agent or authority of any party specified in i or ii above.

   b) discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

FM Global

Account No.  1-78868<br>Policy No.  LP581

c) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

d) seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

e) risks of contraband, or illegal transportation or trade.

f) Terrorism, including action taken to prevent, defend against, respond to or retaliate against Terrorism or suspected Terrorism, except to the extent provided in the TERRORISM coverage in this section of the Policy. However, if direct loss or damage by fire results from any of these acts (unless committed by or on behalf of the Insured), then this Policy covers only to the extent of the Actual Cash Value of the resulting direct loss or damage by fire to property insured. This coverage exception for such resulting fire loss or damage does not apply to any coverage provided in the TIME ELEMENT section of this Policy or to any other coverages provided by this Policy.

Any act which satisfies the definition of Terrorism as provided herein shall not be considered to be vandalism, malicious mischief, riot, civil commotion, or any other risk of physical loss or damage covered elsewhere in this Policy.

If any act which satisfies the definition of Terrorism as provided herein also comes within the terms of item B2a of this EXCLUSIONS clause then item B2a applies in place of this item B2f exclusion.

If any act excluded herein involves nuclear reaction, nuclear radiation or radioactive contamination, this item B2f exclusion applies in place of item B1 of this EXCLUSIONS clause.

References and Application.  The following term wherever used in this Policy means:

Terrorism:

Any act, involving the use or threat of: force, violence, dangerous conduct, interference with the operations of any business, government or other organization or institution, or any similar act,

When the effect or apparent purpose is:

(i) To influence or instill fear in any government (de jure or de facto) or the public, or any segment of either; or

(ii) To further or to express support for, or opposition to, any political, religious, social, ideological or similar type of objective or position.

3) any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:



a) by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

b) by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.

This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured. This coverage does not apply to any act excluded in B2f of this EXCLUSIONS clause. In no event does this Policy cover loss by theft by any individual specified in a or b above.

4) lack of the following services:

a) incoming electricity, fuel, water, gas, steam, refrigerant;

b) outgoing sewerage;

c) incoming or outgoing voice, data or video,

all when caused by an occurrence off the Insured Location, except as provided in SERVICE INTERRUPTION in the PROPERTY DAMAGE or TIME ELEMENT section of this Policy. But, if the lack of such a service directly causes physical damage insured by this Policy on the Insured Location, then only that resulting damage is insured.

5) Earth Movement for property located at Miscellaneous Unnamed Locations in High Hazard Zones for Earth Movement.

C. This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1) faulty workmanship, material, construction or design from any cause.

2) loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3) deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

4) settling, cracking, shrinking, bulging, or expansion of:

a) foundations (including any pedestal, pad, platform or other property supporting machinery).

b) floors.

FM Global

    c)  pavements.

    d)  walls.

    e)  ceilings.

    f)  roofs.

5)  a)  changes of temperature damage (except to machinery or equipment); or

    b)  changes in relative humidity damage,

    all whether atmospheric or not.

6)  insect, animal or vermin damage, except damage done by laboratory animals or insects.

7)  loss or damage to the interior portion of buildings under construction from rain, sleet or snow, whether or not driven by wind; when the installation of the roof, walls and windows of such buildings has not been completed.

D.  This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

  1)  contamination including but not limited to the presence of pollution or hazardous material.

  2)  shrinkage.

  3)  changes in color, flavor, texture or finish.

  4)  fungus, mold or mildew.

Printed 06-May-2005
BINA Rev. Jan. 2005



Account No.  1-78868
Policy No.   LP581

## TIME ELEMENT - SECTION C

**1.**  **LOSS INSURED**

A.  This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured by this Policy:

  1)  to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

  2)  used by the Insured, or for which the Insured has contracted use;

  3)  located at an Insured Location or within 1,000 feet of it, or as provided as TEMPORARY REMOVAL OF PROPERTY or OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION; or

  4)  while at a MISCELLANEOUS PERSONAL PROPERTY Location and such Location is not a Dependent Time Element Location; or

  5)  while in transit as provided by this Policy, and

  6)  during the Periods of Liability described in this section.

B.  This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

  1)  the use of any property or service owned or controlled by the Insured;

  2)  the use of any property or service obtainable from other sources;

  3)  working extra time or overtime; or

  4)  the use of inventory,

  all whether at an Insured Location or at any other location. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.

C.  This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.  Except as respects LEASEHOLD INTEREST, in determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY.

E.  TIME ELEMENT COVERAGE EXTENSIONS – GROUP A also apply for Dependent Time Element Locations. Dependent Time Element Locations shall be considered Insured Locations for application of such Extensions.

Printed 06-May-2005
BINA Rev. Jan. 2005



2.  **TIME ELEMENT COVERAGES**

  A.  **BUSINESS INTERRUPTION**

    1)  Measurement of Loss:

      a)  The recoverable BUSINESS INTERRUPTION loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

        (i)  Net Profit, before deducting income taxes, which is not earned as a direct result of the interruption of production or suspension of business operations or services; and

        (ii)  Fixed Charges, including:

          (a)  administrative expenses, interest on fixed indebtedness, advertising, taxes other than income taxes, insurance;

          (b)  salaries or wages of officers and employees whose services must necessarily be continued or who are employed under contracts guaranteeing annual compensation;

          (c)  vacation, holiday and sick leave pay;

          (d)  expense of heat, light, and power, selling expenses of the plant and branch stores when chargeable to the plant; and

          (e)  any other item that contributes to the Insured's overhead expense as a whole, excluding ordinary payroll,

        all to the extent that these charges continue following the loss and would have been earned had no such interruption happened.

      b)  In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had no interruption of production or suspension of business operations or services occurred.

      c)  If the Insured would have operated at a deficit had no interruption of production or suspension of business operations or services happened, the extent that Fixed Charges would have been earned will be determined by subtracting the operating deficit from the Fixed Charges that need to continue.

      d)  There is recovery hereunder but only to the extent that the Insured is:

        (i)  wholly or partially prevented from producing goods or continuing business operations or services;

FM Global

(ii) unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

(iii) unable to continue such operations or services during the PERIOD OF LIABILITY; and

(iv) able to demonstrate a loss of sales for the operations, services or production prevented.

**B.    EXTRA EXPENSE**

1) Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

a)  Extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and

b)  Extra costs of temporarily using property or facilities of the Insured or others,

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

2) EXTRA EXPENSE Exclusions:  As respects EXTRA EXPENSE, the following are also excluded:

a)  Any loss of income.

b)  Costs that normally would have been incurred in conducting the business during the same period had no physical loss or damage occurred.

c)  Cost of permanent repair or replacement of property that has been damaged or destroyed.

d)  Any expense recoverable elsewhere in this Policy.

3) References and Application.  The following term(s) means:

a)  Normal:

The condition that would have existed had no physical loss or damage occurred.

**C.    LEASEHOLD INTEREST**

1) Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

Printed 06-May-2005
BINA Rev. Jan. 2005

FM Global

a) If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

b) If the lease is canceled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

2) References and Application.  The following term(s) means:

a) Lease Interest:

The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

b) Net Lease Interest:

That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

3) LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, TIME ELEMENT EXCLUSIONS A, B, and C do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

In addition, there is no coverage for the Insured's loss of LEASEHOLD INTEREST directly resulting from physical loss or damage to Personal Property.

**D.  RENTAL INSURANCE**

1) Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a) The fair rental value of any portion of the property occupied by the Insured;

b) The income reasonably expected from rentals of unoccupied or unrented portions of such property; and

c) The rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.



2)  RENTAL INSURANCE Exclusions:  As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

    A.  This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

## 3.  TIME ELEMENT COVERAGE EXTENSIONS – GROUP A

### A.  CIVIL AUTHORITY

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY if an order of civil authority prohibits access to the Insured Location provided such order is the direct result of physical damage of the type insured against under this Policy at the Insured Location or within 1,000 feet of it.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be:

The period of time:

1)  starting at the time of such physical damage; but

2)  not to exceed 30 consecutive days,

this period of time is part of and not in addition to any PERIOD OF LIABILITY applying to any coverage provided in the TIME ELEMENT section.

However this Extension does not apply to LEASEHOLD INTERESTS.

### B.  DELAY IN START UP

BUSINESS INTERRUPTION and EXTRA EXPENSE are extended to cover the Actual Loss Sustained incurred by the Insured during the PERIOD OF LIABILITY due to the reasonable and necessary delay in start up of the business operations directly resulting from physical loss or damage of the type insured to insured property under construction at an Insured Location or property covered by OFF PREMISES STORAGE FOR PROPERTY UNDER CONSTRUCTION.

### C.  DEPENDENT TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to property of the type insured at Dependent Time Element Locations located within the TERRITORY of this Policy.

1)  As respects DEPENDENT TIME ELEMENT:



a) The Insured will influence and cooperate with the Dependent Time Element Location in every way and take any reasonable and necessary action, including the use of other machinery, supplies or locations, to effect mitigation of the loss payable hereunder.

b) In determining the indemnity payable hereunder, the Company will consider the amount of income derived before the date of physical loss or damage and the probable amount of income after the date of loss or damage.

c) TIME ELEMENT EXCLUSIONS C does not apply.

2) DEPENDENT TIME ELEMENT Exclusions:  As respects DEPENDENT TIME ELEMENT, the following additional exclusions apply:

This Policy does not insure loss resulting from:

a) lack of incoming or outgoing transmission of voice, data or video.

b) Earth Movement for locations of a direct customer, supplier, contract manufacturer or contract service provider that are located in High Hazard Zones for Earth Movement.

c) physical loss or damage caused by or resulting from Terrorism, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence of loss.

3) References and Application.  The following term(s) wherever used in this Policy means:

a) Dependent Time Element Location:

(i) Any Location:

(a) of a direct customer, supplier, contract manufacturer or contract service provider to the Insured.

(b) of any company under a royalty, licensing fee or commission agreement with the Insured.

(ii) A Dependent Time Element Location does not include Locations of any company supplying to, or receiving from, the Insured Location, electricity, fuel, gas, water, steam, refrigeration, sewage, voice, data or video.

## D.   EXTENDED PERIOD OF LIABILITY

The BUSINESS INTERRUPTION coverage is extended to cover the reduction in sales resulting from:

1) the interruption of business as covered by BUSINESS INTERRUPTION;

Printed 06-May-2005
BINA Rev. Jan. 2005



Account No.  1-78868
Policy No.  LP581

2) for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred; and

3) commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included herein.

However, this Extension does not apply to BUSINESS INTERRUPTION loss resulting from physical loss or damage caused by or resulting from Terrorism.

EXTENDED PERIOD OF LIABILITY Exclusions:  As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to fines or damages for breach of contract or for late or noncompletion of orders, or penalties of any nature.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

E.    **INGRESS/EGRESS**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to physical prevention of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following exclusions are applicable:

This Policy does not insure loss resulting from:

1) lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and voice, data or video.

2) picketing or other action by strikers except for physical damage not excluded by this Policy.

3) physical loss or damage caused by or resulting from Terrorism, regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss.

Printed 06-May-2005
BINA Rev. Jan. 2005



This Policy does not provide coverage under this Extension for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

**F.    ON PREMISES SERVICES**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet of the Insured Location:

1) Electrical equipment and equipment used for the transmission of voice, data or video.

2) Electrical, fuel, gas, water, steam, refrigeration, sewerage, voice, data or video transmission lines.

**G.    SERVICE INTERRUPTION TIME ELEMENT**

1) This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the Period of Service Interruption at Insured Locations when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service or from the lack of incoming or outgoing voice, data or video service all by reason of any accidental occurrence to the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

2) This Extension will apply when the Period of Service Interruption is in excess of the time shown as Waiting Period in the WAITING PERIOD clause of the DECLARATIONS section.

3) The exclusions in the EXCLUSIONS clause of the PROPERTY DAMAGE section do not apply to SERVICE INTERRUPTION TIME ELEMENT coverage except for A1, A2, A3, A6, B1, B2 and D1. In addition, as respects SERVICE INTERRUPTION TIME ELEMENT coverage the following exclusion applies:

This Policy excludes loss or damage directly or indirectly caused by or resulting from the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

a) Earth Movement for property located in High Hazard Zones for Earth Movement.

b) Terrorism.

c) the interruption of useable voice, data or video service as a result of an accidental occurrence or physical damage to a satellite.

4) Additional General Provisions:

Printed 06-May-2005
BINA Rev. Jan. 2005



Account No. 1-78868
Policy No. LP581

a) The Insured will immediately notify the suppliers of services of any interruption of such services.

b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

5) References and Application. The following term(s) means:

   a) Period of Service Interruption:

     (i) The period starting with the time when an interruption of specified services occurs; and ending when with due diligence and dispatch the service could be wholly restored and the Location receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

     (ii) The Period of Service Interruption is limited to only those hours during which the Insured would or could have used service(s) if it had been available.

     (iii) The Period of Service Interruption does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## 4.  TIME ELEMENT COVERAGE EXTENSIONS – GROUP B

### A.  COMPUTER SYSTEMS–NON PHYSICAL DAMAGE

1) This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the Period of Interruption directly resulting from the failure of the Insured's Electronic Data Processing Equipment or Media to operate, provided such failure is the direct result of a malicious act directed at the NAMED INSURED.

2) This Extension of coverage will apply when the Period of Interruption is in excess of the time shown as Waiting Period in the WAITING PERIOD clause of the DECLARATIONS section.

3) References and Application. The following term(s) means:

   a) Period of Interruption:

     (i) The period starting when the Insured's Electronic Data Processing Equipment or Media fails to operate and ending when with due diligence and dispatch, the Insured's Electronic Data Processing Equipment or Media could be restored to the same or equivalent operating condition that existed prior to the failure.

     (ii) The Period of Interruption does not include the additional time to make changes to the Insured's Electronic Data Processing Equipment or Media.

Printed 06-May-2005
BINA Rev. Jan. 2005



**B.**  **PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT**

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending physical loss or damage insured by this Policy at such insured property.

This Extension does not cover the Actual Loss Sustained by the Insured to temporarily protect or preserve insured property from actual, or to prevent immediately impending, physical loss or damage covered by TERRORISM coverage as provided in the PROPERTY DAMAGE section.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

**C.**  **RELATED REPORTED VALUES**

If reported TIME ELEMENT values include:

1)  locations used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)  a TIME ELEMENT loss would result at such locations,

3)  from insured physical loss or damage at an Insured Location,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such Insured Location.

**D.**  **RESEARCH AND DEVELOPMENT**

The BUSINESS INTERRUPTION coverage is extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges and excluding ordinary payroll directly attributable to the interruption of research and development activities, that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be the period from the time of direct physical loss or damage of the type insured by this Policy to the time when the property could be repaired or replaced and made ready for operations. Such period of time shall not be limited by the date of expiration of the Policy.

**E.**  **SOFT COSTS**

This Policy covers the Actual Loss Sustained incurred by the Insured of Soft Costs during the PERIOD OF LIABILITY arising out of the delay of completion of buildings and additions under construction directly resulting from physical loss or damage of the type insured to insured property under construction at an Insured Location.



Account No.  1-78868
Policy No.  LP581

1) References and Application.  The following term(s) wherever used in this Policy means:

   a)  Soft Costs:

     Expenses over and above normal expenses at Locations undergoing renovation or in the course of construction limited to the following:

     (i)  Construction loan fees - the additional cost incurred to rearrange loans necessary for the completion of construction, repairs or reconstruction including; the cost to arrange refinancing, accounting work necessary to restructure financing, legal work necessary to prepare new documents, charges by the lenders for the extension or renewal of loans necessary.

     (ii)  Commitment fees, leasing and marketing expenses - The cost of returning any commitment fees received from prospective tenant(s) or purchaser(s), the cost of re-leasing and marketing due to loss of tenant(s) or purchaser(s).

     (iii) Additional fees - for architects, engineers, consultants, attorneys and accountants needed for the completion of construction, repairs or reconstruction.

     (iv)  Carrying costs - property taxes, building permits, additional interest on loans, realty taxes and insurance premiums.

## 5.   PERIOD OF LIABILITY

  A.  The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except LEASEHOLD INTEREST and as shown below, or if otherwise provided under any TIME ELEMENT COVERAGE EXTENSION, and subject to any Time Limit provided in the LIMITS OF LIABILITY clause in the DECLARATIONS section, is as follows:

    1)  For building and equipment, the period:

      a)  starting from the time of physical loss or damage of the type insured against; and

      b)  ending when with due diligence and dispatch the building and equipment could be:

        (i)  repaired or replaced; and

        (ii)  made ready for operations,

        under the same or equivalent physical and operating conditions that existed prior to the damage.

      c)  not to be limited by the expiration of this Policy.

    2)  For building and equipment under construction:

FM Global

a) the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

b) due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

3) For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

a) to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

b) to replace physically damaged mercantile stock.

This item does not apply to RENTAL INSURANCE.

4) For raw materials and supplies, the period of time:

a) of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

b) limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5) If water:

a) used for any manufacturing purpose, including but not limited to as a raw material or for power;

b) stored behind dams or in reservoirs; and

c) on any Insured Location,

is released as the result of physical damage of the type insured against under this Policy to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6) For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation. This time does not include research, engineering or any other time necessary to restore or recreate lost information.



This item does not apply to RENTAL INSURANCE.

7)  For physically damaged or destroyed property covered under DATA, PROGRAMS OR SOFTWARE, the time to recreate or restore including the time for researching or engineering lost information.

This item does not apply to RENTAL INSURANCE.

B.  The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

1)  making changes to equipment.

2)  making changes to the buildings or structures except as provided in the DEMOLITION AND INCREASED COST OF CONSTRUCTION clause in the PROPERTY DAMAGE section.

3)  restaffing or retraining employees.

If two or more Periods of Liability apply such periods will not be cumulative.

## 6.  TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure against:

A.  Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

1)  physical loss or damage not insured by this Policy on or off of the Insured Location.

2)  planned or rescheduled shutdown.

3)  strikes or other work stoppage.

4)  any other reason other than physical loss or damage insured by this Policy.

B.  Any increase in loss due to:

1)  suspension, cancellation or lapse of any lease, contract, license or orders.

2)  fines or damages for breach of contract or for late or noncompletion of orders.

3)  for penalties of any nature.

4)  any other consequential or remote loss.



Account No.  1-78868
Policy No.  LP581

C.  Any loss resulting from loss or damage to finished goods manufactured by the Insured, nor the time required for their reproduction.

D.  Any loss resulting from the Actual Cash Value portion of direct physical loss or damage by fire caused by or resulting from Terrorism.

Printed 06-May-2005
BINA Rev. Jan. 2005



Account No. 1-78868
Policy No. LP581

## LOSS ADJUSTMENT AND SETTLEMENT - SECTION D

1.  **LOSS ADJUSTMENT/PAYABLE**

    Loss, if any, will be adjusted with and payable to Howard Hughes Medical Institute, or as may be directed by Howard Hughes Medical Institute. Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee in the Certificates of Insurance on file with the Company or named below.

2.  **CURRENCY FOR LOSS PAYMENT**

    Losses will be adjusted and paid in the currency of the United States of America.

3.  **VALUATION**

    Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the location of the loss, and for no more than the interest of the Insured, subject to the following:

    A.  On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

    B.  On finished goods manufactured by the Insured, the regular cash selling price at the Location where the loss happens, less all discounts and charges to which the finished goods would have been subject had no loss happened.

    C.  On raw materials, supplies and other merchandise not manufactured by the Insured:

        1)  if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

        2)  if not repaired or replaced, the Actual Cash Value.

    D.  On exposed films, records, manuscripts and drawings, that are not Valuable Papers and Records, the value blank plus the cost of copying information from back-up or from originals of a previous generation. These costs will not include research, engineering or any costs of restoring or recreating lost information.

    E.  On property covered under DEFERRED PAYMENTS, the lesser of the:

        1)  total amount of unpaid installments less finance charges.

        2)  Actual Cash Value of the property at the time of loss.

        3)  cost to repair or replace with material of like size, kind and quality.

    F.  On FINE ARTS articles, the lesser of:

FM Global

1) the reasonable and necessary cost to repair or restore such property to the physical condition that existed on the date of loss.

2) cost to replace the article.

3) the value, if any, stated on a schedule on file with the Company.

In the event a Fine Arts article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule. The Insured agrees to surrender the pair or set to the Company.

G.    On property covered under DATA, PROGRAMS OR SOFTWARE:

1) The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

2) If not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

H.    On VALUABLE PAPERS AND RECORDS, the lesser of the following:

1) The cost to repair or restore the item to the condition that existed immediately prior to the loss.

2) The cost to replace the item.

3) The amount designated for the item on the schedule on file with the Company.

I.    On property in transit:

1) Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured. Included in the value are accrued costs and charges legally due. Charges may include the Insured's commission as selling agent.

2) Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount. Prepaid or advanced freight costs are included.

3) Property not under invoice will be valued:

a) for property of the Insured, at the valuation provisions of this Policy applying at the location from which the property is being transported; or

b) for other property, at the actual cash market value at the destination point on the date of occurrence,

less any charges saved which would have become due and payable upon arrival at destination.

Printed 06-May-2005
BBNA Rev. Jan. 2005

FM Global

Account No.  1-78868
Policy No.  LP581

J.    On RESEARCH ANIMALS, the replacement cost plus research and laboratory expenses.

K.    On property that is damaged by fire and such fire is the result of Terrorism, the Actual Cash Value of the fire damage loss.  Any remaining fire damage loss shall be adjusted according to the terms and conditions of the VALUATION clause in this section of the Policy and shall be subject to the limit(s) of liability for TERRORISM and NON CERTIFIED ACT OF TERRORISM as shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section.

L.    On all other property, the loss amount will not exceed the lesser of the following:

    1)   The cost to repair.

    2)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

    3)   The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

    4)   The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

    5)   The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

    6)   The increased cost of demolition, if any, resulting from loss covered by this Policy, if such property is scheduled for demolition.

    7)   The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

    8)   The Actual Cash Value if such property is:

        a)   useless to the Insured; or

        b)   not repaired, replaced or rebuilt on the same or another site within two years from the date of loss.

    The Insured may elect not to repair or replace the insured real and/or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an Insured Location under this Policy.  This item does not extend to DEMOLITION AND INCREASED COST OF CONSTRUCTION.

Page 50



Account No.  1-78868
Policy No.  LP581

References and Application.  The following term(s) wherever used in this Policy means:

a) Actual Cash Value:

The amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

**4.    LOSS CONDITIONS**

**A.    REQUIREMENTS IN CASE OF LOSS**

The Insured will:

1) give immediate written notice to the Company of any loss.

2) protect the property from further loss or damage.

3) promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, Actual Cash Value, replacement value and amount of loss claimed.

4) give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company.  The proof of loss must state the knowledge and belief of the Insured as to:

   a) the time and origin of the loss.

   b) the Insured's interest and that of all others in the property.

   c) the Actual Cash Value and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d) any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e) by whom and for what purpose any location insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5) include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6) further, the Insured, will as often as may be reasonably required:

   a) exhibit to any person designated by the Company all that remains of any property;



    b)  submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

    c)  produce for examination at the request of the Company:

        (i)  all books of accounts, business records, bills, invoices and other vouchers; or

        (ii)  certified copies if originals are lost,

at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## B.    COMPANY OPTION

The Company has the option to take all or any part of damaged property at the agreed or appraised value. The Company must give notice to the Insured of its intention to do so within 30 days after receipt of proof of loss.

## C.    ABANDONMENT

There may be no abandonment of any property to the Company.

## D.    SUBROGATION

The Insured is required to cooperate in any subrogation proceedings. The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

    1)  any applicable deductible; and/or

    2)  any provable uninsured loss,

bears to the entire provable loss amount.

## E.    APPRAISAL

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

    1)  the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

FM Global

2)  the Company has received a signed and sworn proof of loss from the Insured.

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the Actual Cash Value and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)  pay its chosen appraiser; and

2)  bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

F.  **SUIT AGAINST THE COMPANY**

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)  the Insured has fully complied with all the provisions of this Policy; and

2)  legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action needs to be started within the shortest limit of time permitted by such laws.

5.  **SETTLEMENT OF CLAIMS**

The amount of loss, except for ACCOUNTS RECEIVABLE coverage, for which the Company may be liable will be paid within 30 days after:

A.  proof of loss as described in this Policy is received by the Company; and

B.  when a resolution of the amount of loss is made either by:

Printed 06-May-2005
BINA Rev. Jan. 2005



   1)  written agreement between the Insured and the Company; or

   2)  the filing with the Company of an award as provided in the APPRAISAL clause of this section.

## 6.   COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 7.   PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of a loss occurring which has been ascertained to be insured loss or damage under this Policy and determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s) on the insured loss or damage, subject to the Policy's provisions.  To obtain said partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.



Account No.  1-78868<br>Policy No.  LP581

## GENERAL PROVISIONS - SECTION E

1. **ADDITIONAL INSURABLE INTERESTS/CERTIFICATES OF INSURANCE**

    Additional insured interests are automatically added to this Policy as their interest may appear when named as additional named insured, lender, mortgagee and/or loss payee in the Certificates of Insurance on a schedule on file with the Company. Such interests become effective on the date shown in the Certificate of Insurance and will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

2. **CANCELLATION/NON-RENEWAL**

    This Policy may be:

    A.  cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

    B.  cancelled by the Company by giving the Insured not less than:

        1)  60 days' written notice of cancellation; or

        2)  10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

    C.  non-renewed by the Company by giving the Insured not less than 60 days' written notice of non-renewal.

    Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy. Return of any unearned premium will be made by the Company as soon as practicable.

3. **INSPECTIONS**

    The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.

    The Company's:

    A.  right to make inspections;

    B.  making of inspections; or

    C.  analysis, advice or inspection report,

    will not constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrant that the insured property is safe or healthful. This Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

Printed 06-May-2005<br>BINA Rev. Jan. 2005



Account No.  1-78868
Policy No.  LP581

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

4.    **PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS**

A.    If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for Insured Locations within such jurisdictions.

B.    The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America. The endorsements modify this Policy with respect to any insured property located in the state in which the endorsement applies.

C.    As respects the United States, its territories and possessions and the Commonwealth of Puerto Rico any recovery under this Policy for any insured loss or damage from acts of terrorism, as covered under this Policy, may be partially reimbursed by the United States Government in accordance with the Terrorism Risk Insurance Act of 2002. Reimbursement by the United States Government will be under a formula established by Federal Law.

5.    **LIBERALIZATION**

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

6.    **MISREPRESENTATION AND FRAUD**

This entire Policy will be void if, whether before or after a loss, an Insured has:

A.    willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

B.    made any attempt to defraud the Company.

C.    made any false swearing.

7.    **LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS**

A.    The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.    The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

FM Global

1) any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.

2) foreclosure, notice of sale, or similar proceedings with respect to the property.

3) change in the title or ownership of the property.

4) change to a more hazardous occupancy.

The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1) sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2) this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 60 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause. The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension. The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

F.   If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage. No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim. At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.

Printed 06-May-2005
BINA Rev. Jan. 2005



G.  If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.  Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 8.  OTHER INSURANCE

A.  If there is any other insurance that would apply in the absence of this Policy except for personal property of officers, employees and guests, this Policy will apply only after such insurance whether collectible or not.

B.  In no event will this Policy apply as contributing insurance.

C.  The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy. The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy. Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.  The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy. The existence of such other insurance will not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.  In the event this Policy is deemed to contribute with other insurance, the limit of liability applicable at each Location, for purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest Location value on file with the Company.

F.  When this Policy includes property in more than one jurisdiction, separate policies underlying this Policy may be issued by the Company in compliance with jurisdictional requirements. Such underlying policies will not be considered as additional insurance, but as duplicate insurance only.

## 9.  POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this Policy. This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.  create a waiver, or change any part of this Policy; or

B.  prevent the Company from asserting any rights under the provisions of this Policy.



Account No.  1-78868
Policy No.  LP581

10.  **REDUCTION BY LOSS**

Claims paid under this Policy will not reduce its' limit of liability, except claims paid will reduce any Policy Year Aggregate Limit of Liability.

11.  **SUSPENSION**

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured. The suspended insurance may be reinstated by the Company. Any unearned premium resulting from such suspension will be returned by the Company.

12.  **TITLES**

The titles in this Policy are only for reference. The titles do not in any way affect the provisions of this Policy.

Printed 06-May-2005
BINA Rev. Jan. 2005

 FM Global

Account No.   1-78868
Policy No.    LP581

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| MSLU | 000000.00 | MISCELLANEOUS SCHEDULED LOCATIONS<br><br>AS PER THE SCHEDULE OF LOCATIONS ON FILE WITH THIS COMPANY DATED 01-APRIL-2005 |
| 01 | 043701.34 | USA, MARYLAND, CHEVY CHASE, 20815-6720<br>4000 JONES BRIDGE RD<br><br>NEW HEADQUARTERS AND CONFERENCE CENTER |
| 02 | 058556.99 | USA, MICHIGAN, ANN ARBOR, 48109-0726<br>1150 W MEDICAL CENTER DR<br><br>UNIVERSITY OF MICHIGAN |
| 03 | 043119.25 | USA, MARYLAND, BALTIMORE, 21205-2105<br>725 N WOLFE ST<br><br>JOHNS HOPKINS UNIVERSITY |
| 04 | 076251.42 | USA, CALIFORNIA, BERKELEY, 94720-0001<br>HEARST AVENUE<br><br>UNIVERSITY OF CALIFORNIA BERKELEY CAMPUS |
| 05 | 043697.94 | USA, MARYLAND, BETHESDA, 20814-1460<br>1 CLOISTER CT<br><br>CLOISTER NIH |
| 06 | 012980.53 | USA, MASSACHUSETTS, BOSTON, 02115-6013<br>44 BINNEY STREET<br><br>DANA-FARBER CANCER INSTITUTE |
| 07 | 012838.56 | USA, MASSACHUSETTS, BOSTON, 02115-6011<br>20 SHATTUCK ST<br><br>BRIGHAM & WOMEN'S HOSPITAL |



Account No.        1-78868
Policy No.         LP581

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 08 | 012856.51 | USA, MASSACHUSETTS, BOSTON, 02115-5746<br>320 LONGWOOD AVE<br><br>CHILDREN'S HOSPITAL |
| 09 | 012856.51 | USA, MASSACHUSETTS, BOSTON, 02115-5701<br>200 LONGWOOD AVE<br><br>HARVARD MEDICAL SCHOOL |
| 10 | 012855.50 | USA, MASSACHUSETTS, BOSTON, 02114-2605<br>50 BLOSSOM ST<br><br>MASSACHUSETTS GENERAL HOSPITAL |
| 11 | 012697.61 | USA, MASSACHUSETTS, CAMBRIDGE, 02138-2019<br>7 DIVINITY AVE<br><br>HARVARD UNIVERSITY |
| 12 | 000064.64 | USA, ILLINOIS, CHICAGO, 60637-1463<br>5841 S MARYLAND AVE<br><br>UNIVERSITY OF CHICAGO, CAMPUS HOSPITAL |
| 13 | 074210.27 | USA, TEXAS, DALLAS, 75390-7208<br>(DALLAS COUNTY)<br>5323 HARRY HINES BOULEVARD<br><br>UNIVERSITY OF TEXAS |
| 14 | 072499.38 | USA, COLORADO, DENVER, 80206-2761<br>1400 JACKSON ST<br><br>NATIONAL JEWISH CENTER |
| 15 | 080485.27 | USA, NORTH CAROLINA, DURHAM, 27710-0001<br>RESEARCH DRIVE<br><br>DUKE UNIVERSITY MEDICAL CENTER |



Account No.     1-78868
Policy No.      LP581

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 16 | 074404.22 | USA, TEXAS, HOUSTON, 77030<br>(HARRIS COUNTY)<br>1200 MOURSUND AVENUE<br>ONE BAYLOR PLAZA<br><br>BAYLOR COLLEGE OF MEDICINE |
| 17 | 076735.91 | USA, CALIFORNIA, LOS ANGELES, 90024<br>675 CIRCLE DRIVE<br><br>UNIVERSITY OF CALIFORNIA (LOS ANGELES) |
| 18 | 084824.11 | USA, TENNESSEE, NASHVILLE, 37232-0001<br>802 RUDOLPH LIGHT HALL<br><br>VANDERBILT UNIVERSITY MEDICAL CENTER |
| 19 | 019501.36 | USA, CONNECTICUT, NEW HAVEN, 06511-6614<br>YALE UNIVERSITY<br><br>YALE UNIVERSITY |
| 20 | 021330.84 | USA, NEW YORK, NEW YORK, 10032<br>630, 701, 722 WEST 168TH STREET<br><br>COLUMBIA UNIVERSITY |
| 21 | 021355.85 | USA, NEW YORK, NEW YORK, 10021-5476<br>1182, 1188, 1204 & 1240 YORK AVE<br>220-222 EAST 70TH STREET<br><br>ROCKEFELLER UNIVERSITY |
| 22 | 076569.80 | USA, CALIFORNIA, PALO ALTO, 94304-2204<br>300 PASTEUR DR<br><br>STANFORD UNIVERSITY-BECKMAN CENTER |
| 23 | 034047.20 | USA, PENNSYLVANIA, PHILADELPHIA, 19104-6140<br>(PHILADELPHIA COUNTY)<br>422 CURIE BLVD<br><br>UNIVERSITY OF PENNSYLVANIA SCHOOL OF MEDICINE |

 **FM Global**

Account No.   1-78868
Policy No.    LP581

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 24 | 075057.71 | USA, UTAH, SALT LAKE CITY, 84112-8931<br>50 N 2030 E<br><br>UNIVERSITY OF UTAH |
| 25 | 089829.75 | USA, CALIFORNIA, LA JOLLA, 92093-5004<br>9500 GILMAN DR<br><br>UNIVERSITY OF CALIFORNIA (SAN DIEGO) |
| 26 | 076385.21 | USA, CALIFORNIA, SAN FRANCISCO, 94122<br>513 & 533 PARNASSUS & THIRD STREET<br><br>UNIVERSITY OF CALIFORNIA (SAN FRANCISCO) |
| 27 | 078818.86 | USA, WASHINGTON, SEATTLE, 98195-0001<br>1959 NE PACIFIC ST<br><br>UNIVERSITY OF WASHINGTON |
| 28 | 069131.00 | USA, MISSOURI, SAINT LOUIS, 63110-1001<br>4939 CHILDRENS PL<br><br>WASHINGTON UNIVERSITY |
| 29 | 012699.50 | USA, MASSACHUSETTS, CAMBRIDGE, 02139<br>120-140,167,184-190 ALBANY ST<br><br>MASSACHUSETTS INSTITUTE OF TECHNOLOGY |
| 30 | 085453.18 | USA, ALABAMA, BIRMINGHAM, 35294-0001<br>450 WALLACE TUMOR INSTITUTE<br><br>UNIVERSITY OF ALABAMA |
| 31 | 072554.01 | USA, COLORADO, BOULDER, 80309-0001<br>1600 BROADWAY<br><br>UNIVERSITY OF COLORADO |



Account No.   1-78868
Policy No.    LP581

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 32 | 043119.21 | USA, MARYLAND, BALTIMORE, 21210-3301<br>115 W UNIVERSITY PKWY<br><br>CARNEGIE INSTITUTE |
| 33 | 084940.19 | USA, TENNESSEE, MEMPHIS, 38105-2729<br>332 N LAUDERDALE ST<br><br>ST. JUDE'S HOSPITAL |
| 34 | 073493.13 | USA, OKLAHOMA, OKLAHOMA CITY, 73104-4602<br>820 NE 15TH ST<br><br>OKLAHOMA MEDICAL RESEARCH FOUNDATION |
| 35 | 076686.40 | USA, CALIFORNIA, PASADENA, 91106<br>391 HOLLISTON AVENUE<br><br>CALIFORNIA INSTITUTE OF TECHNOLOGY |
| 36 | 032237.31 | USA, NEW JERSEY, PRINCETON, 08540<br>WASHINGTON ROAD<br><br>PRINCETON UNIVERSITY |
| 37 | 012796.10 | USA, MASSACHUSETTS, WALTHAM, 02453-2728<br>415 SOUTH ST<br><br>BRANDEIS UNIVERSITY |
| 38 | 068450.64 | USA, IOWA, IOWA CITY, 52242<br>ECKSTEIN MEDICAL RESEARCH BUILDING<br><br>UNIVERSITY OF IOWA |
| 39 | 076793.15 | USA, CALIFORNIA, LA JOLLA, 92037-1002<br>10010 N TORREY PINES RD<br><br>THE SALK INSTITUTE |



Account No.    1-78868
Policy No.     LP581

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 40 | 022222.21 | USA, NEW YORK, COLD SPRING HARBOR, 11724-2209<br>1 BUNGTOWN RD<br><br>COLD SPRING HARBOR LABORATORIES |
| 41 | 000195.42 | USA, CALIFORNIA, SANTA CRUZ, 95064<br>328 SINSHEIMER<br><br>UNIVERSITY OF CALIFORNIA SANTA CRUZ<br>HHMI-DEPT OF MCD BIOLOGY |
| 42 | 077420.88 | USA, OREGON, EUGENE, 97403<br>1371 EAST 13TH AVENUE<br><br>UNIVERSITY OF OREGON |
| 43 | 021374.00 | USA, NEW YORK, NEW YORK, 10016<br>550-580 1ST AVENUE<br><br>NEW YORK UNIVERSITY |
| 44 | 078820.79 | USA, WASHINGTON, SEATTLE, 98109-4433<br>1100 FAIRVIEW AVE N<br><br>FRED HUTCHINSON CANCER RESEARCH CENTER |
| 45 | 023964.32 | USA, NEW YORK, ALBANY, 12223<br>EMPIRE STATE PLAZA<br><br>NEW YORK STATE DEPARTMENT OF HEALTH - WADSWORTH<br>CENTER |
| 46 | 021281.75 | USA, NEW YORK, BRONX, 10461-1926<br>1300 MORRIS PARK AVE<br><br>ALBERT EINSTEIN COLLEGE OF MEDICINE |
| 47 | 021338.57 | USA, NEW YORK, NEW YORK, 10021-6304<br>430 E 67TH ST<br><br>MEMORIAL SLOAN-KETTERING CANCER CENTER |



Account No.    1-78868
Policy No.     LP581

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 48 | 012860.48 | USA, MASSACHUSETTS, BOSTON, 02111-1817<br>136 HARRISON AVE<br><br>TUFTS UNIVERSITY |
| 49 | 061218.84 | USA, MINNESOTA, MINNEAPOLIS, 55455-0348<br>515 DELAWARE ST SE<br><br>UNIVERSITY OF MINNESOTA, INSTITUTE OF HUMAN<br>GENETICS |
| 50 | 063529.94 | USA, WISCONSIN, MADISON, 53706-1534<br>1525 LINDEN DR<br><br>UNIVERSITY OF WISCONSIN |
| 51 | 011856.04 | USA, MASSACHUSETTS, WORCESTER, 01655<br>55 LAKE AVENUE NORTH<br>2 BIOTECH PARK<br><br>UNIVERSITY OF MASSACHUSETTS |
| 52 | 064224.72 | USA, ILLINOIS, EVANSTON, 60208-0876<br>2225 CAMPUS DR<br><br>NORTHWESTERN UNIVERSITY |
| 53 | 043137.01 | USA, MARYLAND, BALTIMORE, 21250-0001<br>1000 HILLTOP CIRCLE<br><br>UNIVERSITY OF MARYLAND |
| 54 | 031792.26 | USA, NEW JERSEY, PISCATAWAY, 08854-8020<br>190 FRELINGHUYSEN RD<br><br>RUTGERS-WAKSMAN INSTITUTE |
| 55 | 049133.40 | USA, OHIO, CLEVELAND, 44106-3043<br>11001 CEDAR AVE<br><br>CASE WESTERN RESERVE UNIVERSITY |



Account No.    1-78868
Policy No.     LP581

## SCHEDULE OF LOCATIONS, APPENDIX A

| Location No. | Index No. | Location Description |
|---|---|---|
| 56 | 077570.81 | USA, OREGON, PORTLAND, 97239-3011<br>3181 SW SAM JACKSON PARK RD<br><br>OREGON HEALTH SCIENCES UNIVERSITY VOLLUM INSTITUTE |
| 57 | 031790.44 | USA, NEW JERSEY, PISCATAWAY, 08854-5627<br>675 HOES LN<br><br>UNIVERSITY OF MEDICINE & DENTISTRY OF NJ |
| 58 | 022288.30 | USA, NEW YORK, STONY BROOK, 11790<br>SOUTH LOOP ROAD<br><br>SUNY - AT STONEY BROOK SCHOOL OF MEDICINE |
| 59 | 021351.57 | USA, NEW YORK, NEW YORK, 10029-6500<br>1 GUSTAVE L LEVY PL<br><br>THE MOUNT SINAI SCHOOL OF MEDICINE<br>DIVISION OF MOLECULAR MEDICINE |
| 60 | 004510.56 | USA, MAINE, BAR HARBOR, 04609-1523<br>600 MAIN ST<br><br>THE JACKSON LABORATORY |
| 61 | 000214.74 | USA, VIRGINIA, ASHBURN, 20147<br>19700, 19710, 19746 JANELIA FARM BOULEVARD<br>19746 PICKENS WAY<br><br>JANELIA FARM RESEARCH CAMPUS |
| 61A | 000214.74 | USA, VIRGINIA, ASHBURN, 20147-2405<br>19700 JANELIA FARM BLVD<br><br>JANELIA FARM RESEARCH CAMPUS BUILDER'S RISK<br><br>THIS LOCATION IS LISTED FOR PREMIUM PURPOSES ONLY |



Account No.  1-78868
Policy No. LP581

## NEW MADRID SEISMIC ZONE, APPENDIX B

### GROUP A LISTING

**Arkansas, counties of:**
Ashley, Chicot, Desha, Drew, Fulton, Grant, Independence, Izard, Jefferson, Lincoln, Lonoke, Prairie, Pulaski, Saline, Sharp, White

**Illinois, counties of:**
Bond, Calhoun, Christian, Clark, Clay, Clinton, Coles, Crawford, Cumberland, Edwards, Effingham, Fayette, Gallatin, Greene, Hardin, Jasper, Jersey, Lawrence, Macoupin, Madison, Marion, Monroe, Montgomery, Morgan, Pike, Richland, Sangamon, Scott, Shelby, St. Clair, Wabash, Wayne, White

**Indiana, counties of:**
Crawford, Daviess, Dubois, Gibson, Greene, Knox, Lawrence, Martin, Orange, Perry, Pike, Posey, Spencer, Sullivan, Vanderburgh, Warrick

**Kentucky, counties of:**
Breckinridge, Butler, Caldwell, Christian, Crittenden, Daviess, Hancock, Henderson, Hopkins, Logan, Lyon, McLean, Muhlenberg, Ohio, Simpson, Todd, Trigg, Union, Warren, Webster

**Mississippi, counties of:**
Calhoun, Carroll, Chickasaw, Choctaw, Clay, Grenada, Holmes, Humphreys, Issaquena, Itawamba, Lee, Leflore, Lowndes, Monroe, Montgomery, Oktibbeha, Pontotoc, Sharkey, Warren, Washington, Webster, Yalobusha, Yazoo

**Missouri, counties of:**
Audrain, Callaway, Cole, Crawford, Dent, Franklin, Gasconade, Howell, Jefferson, Lincoln, Maries, Marion, Miller, Montgomery, Oregon, Osage, Phelps, Pike, Pulaski, Ralls, Reynolds, Shannon, St. Charles, St. Francois, St. Louis, St. Louis City, Ste. Genevieve, Texas, Warren, Washington

**Tennessee, counties of:**
Cheatham, Dickson, Hickman, Houston, Lawrence, Lewis, Montgomery, Perry, Robertson, Stewart, Wayne

### GROUP B LISTING

**Arkansas, counties of:**
Arkansas, Clay, Craighead, Crittenden, Cross, Greene, Jackson, Lawrence, Lee, Mississippi, Monroe, Phillips, Poinsett, Randolph, St. Francis, Woodruff

**Illinois, counties of:**
Alexander, Franklin, Hamilton, Jackson, Jefferson, Johnson, Massac, Perry, Pope, Pulaski, Randolph, Saline, Union, Washington, Williamson



Account No. 1-78868
Policy No. LP581

## NEW MADRID SEISMIC ZONE, APPENDIX B

**Kentucky, counties of:**
Ballard, Calloway, Carlisle, Fulton, Graves, Hickman, Livingston, Marshall, McCracken

**Mississippi, counties of:**
Alcorn, Benton, Bolivar, Coahoma, De Soto, Lafayette, Marshall, Panola, Prentiss, Quitman, Sunflower, Tallahatchie, Tate, Tippah, Tishomingo, Tunica, Union

**Missouri, counties of:**
Bollinger, Butler, Cape Girardeau, Carter, Dunklin, Iron, Madison, Mississippi, New Madrid, Pemiscot, Perry, Ripley, Scott, Stoddard, Wayne

**Tennessee, counties of:**
Benton, Carroll, Chester, Crockett, Decatur, Dyer, Fayette, Gibson, Hardeman, Hardin, Haywood, Henderson, Henry, Humphreys, Lake, Lauderdale, Madison, McNairy, Obion, Shelby, Tipton, Weakley



Account No. 1-78868
Policy No. LP581

## PACIFIC NORTHWEST SEISMIC ZONE, APPENDIX B

**Washington, counties of:**
Clallam, Grays Harbor, Island, Jefferson, King, Kitsap, Lewis, Mason, Pierce, Skagit, Snohomish, Thurston, Whatcom

Account No. 1-78868
Policy No. LP581

**This endorsement is applicable to Locations in the State of New York and remains in effect until December 31, 2005**

## SUPPLEMENTAL UNITED STATES
## CERTIFIED ACT OF TERRORISM ENDORSEMENT

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002**

In consideration of an additional premium charged of USD$687 pro rated premium from the Policy's inception date through December 31, 2005 (Annual premium of USD$915), this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy or any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act).

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, does not serve to create coverage for any loss which would otherwise be excluded under this endorsement or the Policy.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 90% of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy. The Premium charged for this coverage is provided above.

The coverage provided by this endorsement only applies to a Certified Act of Terrorism.

Reference and Application: The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "certified act of terrorism" include the following:

    a.  The act resulted in aggregate losses in excess of $5,000,000; and

    b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

Account No. 1-78868
Policy No. LP581

**This endorsement is applicable to Locations in the State of New York and remains in effect until December 31, 2005**

### SUPPLEMENTAL UNITED STATES
### NON CERTIFIED ACT OF TERRORISM ENDORSEMENT

**Coverage for "Non Certified Act(s) of Terrorism".**

With respect to Locations in the United States, its territories and possessions and Puerto Rico, the definition of a "Non Certified Act of Terrorism" contained in this endorsement will apply in place of the definition of Terrorism contained in Terrorism Exclusion, item B.2)f) of the Policy.

Multiple acts of terrorism which occur within a 72 hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one act.

The coverage afforded by this endorsement and any other Terrorism coverage provided in the Policy are mutually exclusive, and any coverage provided by this endorsement and any other Terrorism coverage provided in the Policy do not apply to the same act and are not additive.

Coverage under this endorsement does not apply to any element of loss or damage that is otherwise excluded under this Policy.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

Reference and Application: The following term(s) means:

Non Certified Act of Terrorism

A "Non Certified Act of Terrorism" means an act that involves a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appear to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002.

Account No. 1-78868
Policy No. LP581

**This endorsement applies to all Locations in the United States (except in the State of New York), its territories and possessions and Puerto Rico**

## SUPPLEMENTAL UNITED STATES
## NON CERTIFIED ACT OF TERRORISM ENDORSEMENT

Coverage for "Non Certified Act(s) of Terrorism".

With respect to Locations in the United States, its territories and possessions and Puerto Rico, the definition of a "Non Certified Act of Terrorism" contained in this Endorsement will apply in place of the definition of Terrorism contained in the Terrorism exclusion, item B.2)f) under the EXCLUSIONS clause in the PROPERTY DAMAGE section of the Policy.

It is agreed that the coverage provided by this Endorsement shall expire 31 December 2005 simultaneously with the expiration of the Terrorism Risk Insurance Act of 2002 unless the Terrorism Risk Insurance Act of 2002 as originally enacted is extended by an Act of the United States Congress. In that event, coverage under this Endorsement will expire on the earliest of the expiration or cancellation date of the Policy to which it is attached or the revised expiration date of the United States Terrorism Risk Insurance Act of 2002. It is further agreed that an additional pro-rata premium will be due upon any extension of coverage.

Multiple acts of terrorism which occur within a 72 hour period and appear to be carried out in concert or to have a related purpose or common leadership will be deemed to be one act.

The coverage afforded by this Endorsement and any other Terrorism coverage provided in the Policy are mutually exclusive, and any coverage provided by this Endorsement and any other Terrorism coverage provided in the Policy do not apply to the same act and are not additive.

Coverage under this Endorsement does not apply to any element of loss or damage that is otherwise excluded under this Policy.

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

Reference and Application: The following term(s) means:

Non Certified Act of Terrorism

A "Non Certified Act of Terrorism" means an act that involves a violent act or an act that is dangerous to human life, property or infrastructure that is committed by an individual or individuals and that appear to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion and the act is not certified as a terrorist act pursuant to the federal Terrorism Risk Insurance Act of 2002.

Account No. 1-78868
Policy No. LP581

**This endorsement is applicable to all Locations in the United States (except in the State of New York), its territories and possessions and Puerto Rico**

## SUPPLEMENTAL UNITED STATES
## CERTIFIED ACT OF TERRORISM ENDORSEMENT

**Coverage for "Certified Act of Terrorism" Under The Terrorism Risk Insurance Act of 2002**

In consideration of a premium charged of USD$18,080 pro rated premium from the Policy's inception date through December 31, 2005 (Annual premium of USD$24,085), this Policy, subject to the terms and conditions therein and in this Endorsement, covers direct physical loss or damage to insured property and any resulting TIME ELEMENT loss, as provided in the TIME ELEMENT section of the Policy, caused by or resulting from a Certified Act of Terrorism as defined herein.

It is agreed that the coverage provided by this Endorsement shall expire 31 December 2005 simultaneously with the expiration of the Terrorism Risk Insurance Act of 2002 unless the Terrorism Risk Insurance Act of 2002 as originally enacted is extended by an Act of the United States Congress. In that event, coverage under this Endorsement will expire on the earliest of the expiration or cancellation date of the Policy to which it is attached or the revised expiration date of the United States Terrorism Risk Insurance Act of 2002. It is further agreed that an additional pro-rata premium will be due upon any extension of coverage.

Notwithstanding anything contained elsewhere in this Policy, any exclusion or limitation of terrorism in this Policy and any endorsement attached to and made a part of this Policy, is hereby amended to the effect that such exclusion or limitation does not apply to a "Certified Act of Terrorism" as defined herein.

This amendment does not apply to any limit of liability for a Certified Act of Terrorism, if any, stated under the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy. Nor does the coverage provided by this Endorsement insure any TIME ELEMENT loss as provided in the TIME ELEMENT section of this Policy for more than the number of months shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section of this Policy.

With respect to any one or more Certified Act(s) of Terrorism, this Company will not pay any amounts for which the Company is not responsible under the terms of the Terrorism Risk Insurance Act of 2002 (including subsequent action of Congress pursuant to the Act).

The terms and limitations of any terrorism exclusion, or the inapplicability or omission of a terrorism exclusion, do not serve to create coverage for any loss which would otherwise be excluded under this Endorsement or the Policy.

The coverage provided under this Endorsement for "Certified" losses caused by acts of terrorism will be partially reimbursed by the United States Government under a formula established by Federal Law. Under this formula, the United States pays 90% of covered terrorism losses exceeding a statutorily established retention by the insurer referenced in this Policy. The premium charged for this coverage is provided above.

The coverage provided by this Endorsement only applies to a Certified Act of Terrorism.

Reference and Application: The following term(s) means:

Certified Act of Terrorism:

A "Certified Act of Terrorism" means any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State, and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The criteria contained in that Act for a "Certified Act of Terrorism" include the following:

a.  The act resulted in aggregate losses in excess of $5,000,000; and

b.  The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

# EXHIBIT 2

HHMI

*Property Insurance Meeting*

# Howard Hughes Medical Institute
Property Insurance Program
Meeting @ HHMI Bethesda, MD
Thursday, January 20, 2005 @ 2:00 PM

## Attendees

Sue Plotnick – HHMI

Peter Hardinge – FM Global

Audrey Greening – Aon Washington, DC

Charles Reilly – Aon Philadelphia

## Agenda

**1 – FM April 1, 2005 Renewal Overview**

**2 – Property Valuation Method**

**3 – Contribution Values**

**4 – TRIA Terrorism update**

**5 – Janelia Farm update**

**6 – New FM Policy Form**

**7– Follow-up / Action Items**

# EXHIBIT 3

DC / REG
Factory Mutual Insurance Company
P. O. Box 7500, Johnston, RI 02919

FM Global

IF YOU HAVE ANY QUESTIONS, PLEASE CALL:

NIGEL GRIMM
703-860-4101 EXT:6229

INSURED:            HOWARD HUGHES MEDICAL INSTITUTE

LOCATION OF LOSS:  ASHBURN  VA

TYPE OF LOSS:      FIRE-LOCATION

CLAIMS OPS. OFFICE:   WASHINGTON

PLEASE EXECUTE AND RETURN
THE ENCLOSED FORM(S)

FORMS ENCLOSED:

_____ Statement of Settlement or Proof of Loss

_____ Subrogation

_____ Loan Receipt

_____ Other

ACCOUNT NO:        0078868
POLICY NO:         00LP581
CLAIM NO:          BC038
FM LOSS NO:
DATE OF LOSS:      2/5/2006
TRANSACTION ID:    P0056837

CHECK NO:          073296
CHECK DATE:        4/21/2006
AMOUNT:            ***$1,000,000.00

HOWARD HUGHES MEDICAL INSTITUTE
4000 JONES BRIDGE ROAD
CHEVY CHASE, MD 20815

Wachovia Connection Information Reporting                          Page 1 of 1

```
STATUS:   PROCESSED         TIME: 10:52
VIA:      FED               VALDT: 10/23/06      INCOMING WIRE - CREDIT
CREDIT BANK/ACCOUNT:        WBMD  D  2000028812579
CREDIT NAME:                HOWARD HUGHES MEDICAL INSTITUTE
USD EQUIVALENT:                        $600,000.00
TRANSACTION AMT:            USD        600,000.00
ADVICE:                     061023-018787
REF #:                      1023B6B7HU3R00121010231051FT01
SENDER FI:                  026009593
SENDER FI NAME:             BANK OF AMERICA NT & SA
RECEIVER FI:                055003201
RECEIVER FI NAME:           WACHOVIA BANK OF MARYLAND
ORIGINATOR ID CODE/ID:      000107002405
ORIGINATOR NAME:            FMIC CONCENTRATION
ORIGINATOR FI CODE/ID:      000107002405
ORIGINATOR FI NAME:         FACTORY MUTUAL INSURANCE CO
ORIGINATOR FI ADDRESS:      ATTN: MR. JAMES M. BURTON
                            P O BOX 7500
                            JOHNSTON, RI          02919-0750
CHARGE INSTRUCTIONS/AMOUNT: SHARED
BENEFICIARY ID CODE/ID:     D2000028812579
BENEFICIARY NAME:           HOWARD HUGHES MEDICAL INSTITUTE
BENEFICIARY REF:            620096
ORIGINATOR TO BENEFICIARY INFO:  INSURANCE CLAIM
INSTRUCTING FI ID CODE/ID:  S BOFAUS3N
INSTRUCTING FI NAME:        BANK OF AMERICA NT & SA
INSTRUCTING FI ADDRESS:     37-41 BROAD STREET
                            NEW YORK,NY           USA 10004
                               *** END   OF   WIRE ***
```

© Wachovia Corporation, 2004

Wachovia Connection Information Reporting

```
STATUS:   PROCESSED              TIME: 09:50
VIA:      FED                    VALDT: 08/28/06    INCOMING WIRE - CREDIT
CREDIT BANK/ACCOUNT:             WBNC  D  2000001023369
CREDIT NAME:                     HOWARD HUGHES MEDICAL INSTITUTE
USD EQUIVALENT:                         $1,700,000.00
TRANSACTION AMT:                 USD      1,700,000.00
ADVICE:                          060828-012953
REF #:                           0828B6B7HU9R00097508280950FT01
SENDER FI:                       026009593
SENDER FI NAME:                  BANK OF AMERICA NT & SA
RECEIVER FI:                     053000219
RECEIVER FI NAME:                WACHOVIA BANK OF NORTH CAROLINA
ORIGINATOR ID CODE/ID:           000107002405
ORIGINATOR NAME:                 FMIC CONCENTRATION
ORIGINATOR FI CODE/ID:           000107002405
ORIGINATOR FI NAME:              FACTORY MUTUAL INSURANCE CO
ORIGINATOR FI ADDRESS:           ATTN: MR. JAMES M. BURTON
                                 P O BOX 7500
                                 JOHNSTON, RI              02919-0750
CHARGE INSTRUCTIONS/AMOUNT:      SHARED
BENEFICIARY ID CODE/ID:          D2000001023369
BENEFICIARY NAME:                HOWARD HUGHES MEDICAL INSTITUTE
BENEFICIARY REF:                 456048
ORIGINATOR TO BENEFICIARY INFO:  INSURANCE CLAIM
INSTRUCTING FI ID CODE/ID:     S BOFAUS3N
INSTRUCTING FI NAME:             BANK OF AMERICA NT & SA
INSTRUCTING FI ADDRESS:          37-41 BROAD STREET
                                 NEW YORK,NY          USA 10004
                                    *** END   OF   WIRE ***
```

© Wachovia Corporation, 2004

Wachovia          8/8/2007 11:38 AM  PAGE   3/004   Fax Server

WACHO AUG. 8. 2007 11:23AM                    REPORTID P3FT5G18   RUN 13-            NO. 1277   P. 2
FULL TRANSACTION REPORT                                          FOR 12-MAR-2007   30:0   PAGE 48,369

<<< TRN: 070312-040236 >>>
------------------------------------------------------------------
**** MESSAGE ENVELOPE ****              ( Bank : 001 )

SRC:FED CALLER:                              EKT:

RPTN        AMCH:293,575.00              CUR:USD              TRDNS
TEST: VAL:                               TYP:FTR/  FNDS:N CHG:DR:N CO:Y COM:W CBL:N
------------------------------------------------------------------
DBT A/026009593                          CDT 4D/014:2000028612979     ADV:LTR
DEPT:0000000S                            EDWARD HUGHES MEDICAL INSTITUTE
BANK OF AMERICA NT & SA                  JANELIA FARM INSURANCE PROCEEDS
100 WEST 33RD STREET                     4000 JONES BRIDGE RD:GENERAL ACCTG
NEW YORK,NY          USA 10001           CHEVY CHASE MD   20815
SEND:B/BOFAUS3N                          BNF:/                        CHG:S BKTN
BANK OF AMERICA NT & SA
100 WEST 33RD STREET
NEW YORK,NY          USA 10001
SNDR REF NUM:20070312001174596
ORDERING BNK:/0001070024D5
FACTORY MUTUAL INSURANCE CO
ATTN: MS. JAMES M. BURTON
P O BOX 7500
JOHNSTON, RI          02919-0750
ORIG:/0001070024D5
FMIC CONCENTRATION

REF NUM:1172142


{1100} Message Disposition:
        Format Version:             02 (New expanded format)
        Test Production Code:       P  (Production)
        Msg Duplication Code:          (Original incoming msg)
        Msg Status Indicator:       N  (Incoming msg)

{1110} Acceptance Timestamp:
        Date:                       03/12
        Time:                       13:42
        Application Id:             FT01

{1120} OMAD:
        Output cycle date:          2007/03/12
        Output Destination Id:      BBBTADLC
        Output sequence number:     003695
        Output date:                03/12
        Output time:                13:42
        Output application Id:      FT01

{1510} Type/Subtype Code:
        Type Code:                  10 (Transfer of funds)
        Subtype Code:               00 (Regular transfer)

Received AUG/08/2007 11:21:34 AM [Eastern Daylight Time]

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Howard Hughes Medical Institute,<br><br>                              Plaintiff,<br><br>        v.<br><br>Factory Mutual Insurance Company,<br><br>                              Defendant. | Civil Action No.  07-420<br><br>**Affidavit of Marshall Gilinsky In Opposition to Defendant's Motion To Change Venue** |

STATE OF NEW YORK    §
                                         §
COUNTY OF NEW YORK §

MARSHALL GILINSKY, being duly sworn, deposes and says:

1.    I am an attorney at Anderson Kill & Olick, P.C., which represents the Plaintiff in the above-captioned action.  I make this affirmation in opposition to Defendant's Motion To Change Venue.  I have personal knowledge of the facts stated herein, and they are all true and correct.

2.    Attached hereto as Exhibit "1" is a true and correct copy of the Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment filed in the United States District Court for the Southern District of New York by Factory Mutual Insurance Company in the case captioned: *Retail Brand Alliance, Inc. v. Factory Mutual Insurance Company*, No.: 05-CIV-1031(RJH).

_____
Marshall Gilinsky

SUBSCRIBED AND SWORN TO BEFORE ME,
the undersigned Notary Public,
on the _9th_ day of August, 2007.

_____
Notary Public in and for the
State of New York

MARIE ZITO
Notary Public, State of New York
No. 60-4749793
Qualified in Westchester County
Term Expires January 31, 2010

NYDOCS1-869135.1

# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------- X

Retail Brand Alliance, Inc.,                    :

              Plaintiff,                    :        **CIV. ACTION NO.: 05-CV-1031(RJH)**

     -against-                            :        **DEFENDANT'S MEMORANDUM IN**
                                                          **OPPOSITION TO PLAINTIFF'S**
Factory Mutual Insurance Company,               :        **MOTION FOR PARTIAL SUMMARY**
                                                          **JUDGMENT**
           Defendant.

------------------------------------- X

     Defendant Factory Mutual Insurance Company ("FM Global") hereby submits this Memorandum in Opposition to Plaintiff's Motion for Partial Summary Judgment.

## INTRODUCTION

     On July 31, 2006, FM Global filed its Motion for Partial Summary Judgment. In that Motion, FM Global asked the Court for a ruling that the Period of Liability under the insurance policy ("the Policy) issued to Retail Brand Alliance ("RBA") is limited to the time necessary for RBA to replace its lost stores in an alternative location and make them ready for operations at that location.

     On September 22, 2006, RBA filed its Response and Cross-Motion for Partial Summary Judgment. In this Cross-Motion, RBA apparently seeks a determination that the Period of Liability extends to the time necessary to replace the lost stores and make them ready for operations "at a location with a sales environment that is comparable to the one which existed at the WTC shopping mall before 9/11." RBA further asks the Court to rule that "if no such comparable alternative location exists, it is entitled to coverage for the time reasonably necessary

to rebuild the WTC, including the mall, with 'due diligence and dispatch.'" [1]

Because RBA's claimed Period of Liability unreasonably distorts the plain language of the Policy, and because FM Global's reading is the only reasonable interpretation of the Policy, FM Global now asks the Court to deny RBA's Cross-Motion for Partial Summary Judgment.

## FACTS

The general facts giving rise to this action are well-established and need not be elaborately described here. The parties do not dispute that RBA had three stores in the World Trade Center mall, all three of which were destroyed on September 11, 2001. The parties further agree that at the time, RBA possessed a property insurance policy through FM Global, which policy is now the subject of this action. FM Global has not denied any part of RBA's claim, and the current litigation revolves around the total measurement of RBA's business interruption claim, including the length of the Period of Liability under the Policy, which is the subject of the current Cross-Motions.

In its Memorandum in Support of its Cross-Motion for Partial Summary Judgment, RBA states several "facts" that FM Global disputes. FM Global will also respond to RBA's Separate Statement of Undisputed Facts, but several of the arguments claimed as facts by RBA must also be addressed here.

First, RBA extensively discusses the assertion that its World Trade Center stores were the most profitable in its system and elaborates at length on the retail environment of the World Trade Center complex and its surroundings pre-9/11. RBA also claims that "FM knew the Stores were high performing stores, and knew that replacing such stores was essentially impossible." While FM Global does not dispute that the World Trade Center stores were high-volume stores,

---

[1] In its Memorandum in Support of its Cross-Motion, RBA addresses issues of mitigation and post-loss sales measurement, rather than Period of Liability. *See* Fact section C, Argument section G. RBA has agreed that it does not seek relief on these issues, and FM Global does not address those issues here.

it does dispute that it had any insight into the retail market as a whole or the feasibility of achieving a comparable sales volume at another location. Annual values for the World Trade Center stores were reported to FM Global, as were values for all RBA stores, regardless of size or profitability, to help FM Global assess total risk and set premiums for the account. *See* Affidavit of Jim Bettner, paragraphs 6 – 9. FM Global's knowledge of the World Trade Center stores was the same as its knowledge of other RBA stores nationwide.

RBA also asserts that FM Global's claims personnel believe that the Period of Liability should be tied to the rebuilding of the World Trade Center. This assertion is patently false and distorts the testimony of FM Global witnesses. At no time did FM Global consider the rebuilding of the World Trade Center to be an accurate measurement of the Period of Liability under the Policy. *See* Deposition of Fred Popko, pp. 61-62, 90, Attached to Affidavit of Emily Hennen as Exhibit 1. FM Global has consistently maintained that the Period of Liability ends at the time when RBA could replace its lost stores at an alternative location and make them ready for operations at that location. Any other time periods FM Global may have investigated were strictly for the purpose of negotiating and settling the claim, and did not reflect FM Global's view of the Policy language. See Popko Deposition, p. 113; Deposition of Donald J. Gibbs, p. 229-230, 250-251, Attached to Affidavit of Emily Hennen as Exhibit 2.

These "facts" as stated by RBA are incorrect and do not represent FM Global's knowledge or interpretation of the Policy. FM Global's position throughout the claims adjustment period and this litigation has been consistent with the position taken in its Motion for Partial Summary Judgment and here, that the Period of Liability is not tied to the rebuilding of the World Trade Center complex.

## ARGUMENT

RBA's reading of the Period of Liability provision of the Policy ignores the provision's plain language and unreasonably distorts its meaning. By extending the Period of Liability beyond the insured space to the entire World Trade Center complex, including the leased space of other tenants and the area surrounding the World Trade Center, RBA asks this Court to rule that FM Global is required to somehow recapture the moment in time before the 9/11 attack. This is an absurd result not supported by the language of the Policy or relevant case law.

**A)**     **The language of the Policy is unambiguous, and reference to extrinsic evidence is inappropriate to interpret the Policy.**

RBA spends considerable time in its Memorandum discussing extrinsic evidence it claims supports its interpretation of the Period of Liability. But, neither party to this action has ever claimed that any term of the Policy is ambiguous. Rather, both parties argue that the Policy unambiguously supports their respective positions. Under these circumstances, reference to extrinsic evidence for purposes of Policy interpretation is unnecessary and inappropriate, and the Court may decide the issue based on the four corners of the Policy itself. *See, Lava Trading, Inc. v. Hartford Fire Ins. Co.*, 365 F.Supp.2d 434, 440 (S.D.N.Y. 2005).

**B)**     **Under the terms of the Policy, the Period of Liability is tied to RBA's leased space.**

The Policy issued to RBA is a property insurance policy, covering RBA's corporate headquarters and several distribution facilities, as well as all RBA's hundreds of retail stores nationwide. The retail stores covered are listed on a "Schedule of Retail Stores" kept on file with FM Global. *See* Exhibit 5 to Affidavit of Finley Harckham, p. 1 of 6 (RBAFM 000000057). This Schedule was updated yearly to reflect store openings and closings, and the values reported for all stores were used to help FM Global assess total risk on the account and set premiums. *See* Affidavit of Jim Bettner, paragraphs. 8 and 9; Exhibit 22 to Affidavit of Finley Harckham.

- 4 -

Despite RBA's contention that the World Trade Center stores were their most profitable and most important, there is no indication anywhere in the Policy or Schedule of Locations that these stores were treated any differently for insurance purposes. Rather, the World Trade Center stores were subject to the same terms and conditions as any other of RBA's hundreds of stores. The Period of Liability which applies to the World Trade Center stores is therefore also the same as the Period that would apply to any other RBA store.

The Period of Liability provision of the Policy states that the Period begins with the loss, and ends when, with due diligence and dispatch, the building and equipment could be:

(i) repaired or replaced; and

(ii) made ready for operations,

under the same or equivalent physical and operating conditions that existed prior to the damage.

*See* Exhibit 5 to Affidavit of Finley Harckham, p. 34 (RBAFM 000000037). The "building and equipment" referenced is RBA's leased space, and any RBA personal property inside that space. There is nothing in this language, or in any other language of the Policy, that extends the Period to the World Trade Center complex or any other property outside RBA's leased space. The Period of Liability must be tied, under the clear terms of the Policy, to the replacement of RBA's insured property, which does not include the World Trade Center towers, mall, or any other property outside RBA's leased space.

RBA argues that FM Global's interpretation of the Policy "ignores physical and operating conditions which existed outside the Stores." This is inaccurate. It is FM Global's position that the length of the Period of Liability is not tied to factors outside RBA's leased space. FM Global acknowledges that factors outside the leased space often affect a variety of Policy-related issues. The high volume of sales that RBA experienced at the World Trade Center stores, as well as the

presence or absence of a customer base, competitors and other environmental factors may well affect the measurement of RBA's lost sales and total business interruption claim. Those factors do not, however, affect the length of the Period of Liability, which is the sole subject of both FM Global's Motion for Partial Summary Judgment and RBA's Cross-Motion for Partial Summary Judgment. RBA's arguments about the location of the World Trade Center stores and their allegedly unique access to customers may have bearing on how the total amount of business interruption insurance due to RBA is calculated, but they do not affect the length of the Period of Liability. The Period of Liability is inextricably linked to the insured property – RBA's leased space, and must end when RBA could replace its stores at an alternative location and make them ready for operations at that location.

**C.    The term "under the same or equivalent physical and operating conditions" does not extend the Period of Liability to property outside RBA's leased space.**

RBA argues that because the Period of Liability extends to the time necessary to replace the building and equipment and make it ready for operations "under the same or equivalent physical and operating conditions," the Period of Liability must extend to the time RBA's stores could be replaced in a rebuilt World Trade Center complex, or location with "a sales environment that is comparable to the one which existed at the WTC shopping mall before 9/11." This is an unreasonable and unsupported reading of the Policy language.

The Period of Liability provision ensures the following: that when an RBA store is destroyed, RBA will receive business interruption insurance until such time as that store can be replaced with the same or equivalent physical characteristics, including square footage, necessary improvements, and quality of material, and made ready to operate as it had before the loss. This means that if the lost store occupied 10,000 square feet of retail space, with marble flooring and track lighting, the replacement store must also occupy 10,000 square feet of retail

space, and have flooring and lighting of the same or equivalent quality as that which was lost. Further, FM Global will guarantee that if an RBA store could process 1,000 customers a day before the loss, the replacement store must be made capable of processing 1,000 customers a day. This may include time for stocking, advertising, or scheduling store opening activities. The insured space must be replaced to be the same as or equivalent to what was lost, and must be ready to operate as it did before the loss.

What the Policy does not do, however, is guarantee that the world outside the insured space will be the same or equivalent to what it was before the loss. The Policy does not guarantee actual access to a particular retail environment, customer base, or the presence or absence of competitors. This is true because the Period of Liability is tied to the "building and equipment," RBA's leased space, whether in the World Trade Center or elsewhere. There is no Policy language that can reasonably be read to link the Period of Liability to anything other than the replacement of the "building and equipment." [2]

**D)      RBA's claimed Period of Liability cannot be harmonized with the Policy as a whole.**

RBA's reading of the Period of Liability renders the Extended Period of Liability provision of the Policy superfluous, a result which violates the rules of contract interpretation. The Policy must be read as a whole, giving meaning to each term consistent with the other terms of the Policy. *See, e.g. Schmidt v. Magnetic Head Corp.*, 97 A.D.2d 151, 468 N.Y.S.2d 649 (1983).

As discussed above, the Period of Liability ends when the insured property can be repaired or replaced and made ready for operations under the same or equivalent physical and

---

[2] The Policy does contemplate the fact that stores are often located in malls or other retail environments. Under the Contingent Time Element – Anchor Stores provision, the Policy provides business interruption insurance to the insured for damage to anchor stores. This coverage is limited in both time and amount, and does not affect the measurement of the Period of Liability at issue here.

operating conditions that existed prior to the damage.  *See* Exhibit 5 to Affidavit of Finley

Harckham, p. 34 (RBAFM 000000037).  The Extended Period of Liability provision states that

the Gross Earnings coverage of the Policy is extended to:

> 1) the interruption of business as covered by GROSS EARNINGS;
>
> 2)  for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred; and
>
> 3)  commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included herein.

*Id.*, p. 30 (FMRBA 000000033).  This period, according to the Time Limits found in the

Declarations, is limited to 60 days.  *Id.*, p. 4 (RBAFM 000000007).  The Policy therefore

contemplates the fact that the replacement stores might not immediately experience the same

level of business as they did before the loss, and provides for a limited time *after* the Period of

Liability for RBA's lost stores to recover their prior profitability.

Under RBA's reading of the Policy, the Period of Liability extends until such time as the

World Trade Center complex and all its surroundings can be replaced, and the replaced stores are

returned to the exact business conditions they had prior to the loss.  RBA's claimed Period of

Liability would therefore render the Extended Period of Liability provision meaningless, because

no additional time would be needed for the stores to return to prior levels of business.

Courts have rejected periods of restoration such as RBA proposes for this very reason.

For example, in *Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.*, 411 F.3d 384, 392-93

(2nd Cir. 2005), the Second Circuit rejected the District Court's determination that the period of

restoration under the policy extended until such time as the insured's business could resume its

prior levels of business.  The court stated that such a period would render the extended recovery

period provision in the policy superfluous, and artificially extend the policy's coverage beyond

the twelve month period provided therein.    See also American Guar. and Liability Ins. Co. v. Southern Minnesota Beet Sugar, 320 F.Supp.2d 879, 882-83 (D. Minn. 2004) (holding that the period of restoration could not be read to "eclipse and consume" the extended period of recovery provision under the policy).    RBA's reading of the Period of Restoration likewise renders meaningless another provision of the Policy, and should therefore be rejected.

      **E)**     **RBA's claimed Period of Liability creates an absurd result unsupported by Policy language.**

     RBA's claim that it is entitled to a Period of Liability tied to factors outside its insured space creates an absurd result that finds no support either in Policy language on in law. Although FM Global does not believe that extrinsic evidence should be used to interpret the Policy, various items of extrinsic evidence demonstrate the absurd logic of RBA's position, and the disingenuous nature or RBA's proposed "alternative" to tying the Period of Liability to the rebuilding of the World Trade Center.    For the sole purpose of demonstrating this absurdity, FM Global addresses that extrinsic evidence here.

      **1)**     **RBA's true position is that the Period of Liability extends to the time necessary to rebuild the World Trade Center complex and surrounding environment.**

     RBA seeks a ruling from this Court that the Period of Liability extends to the time when RBA could replace its stores at a location with "a sales environment that is comparable to the one which existed at the WTC shopping mall before 9/11." For the reasons described above, the Policy simply does not guarantee RBA a particular retail sales environment or access to a particular flow of customers, or the presence or absence or particular competitors. The Policy provides only that RBA may replace its stores in an alternative location and make them ready for operations. This proposed "alternative" is a disingenuous attempt by RBA to create the illusion that its position is reasonable, and that it does not seek exclusively to tie the Period of Liability to

the rebuilding of the World Trade Center complex and its surroundings. In fact, RBA demands exactly that, and FM Global asks this Court to reject this unreasonable and absurd claim.

The exhibits attached to the Affidavit of Finley Harckham demonstrate that RBA does not truly believe that any location other than a rebuilt World Trade Center complex will suffice to end the Period of Liability. RBA has gone to great lengths throughout the claim adjustment process and even in the current exchange of briefing to establish its claim that the World Trade Center mall was a unique retail environment. For example, RBA's Exhibits include multiple news articles about the high volume of sales the World Trade Center shopping mall experienced before 9/11 and how difficult it would be for retailers to establish comparable sales in other locations. *See* Exhibits 1, 2, and 3 to Affidavit of Finley Harckham. RBA's witnesses have also testified that the World Trade Center stores were unique and could not be replaced, in terms of sales volume, at another location. *See* Deposition of Janice Kocot LaBroad, Exhibit 7 to Affidavit of Finley Harckham (p. 83: "Q: Was any consideration given to rebuilding at another location, rebuilding these stores? A: You could never rebuild these stores."; p. 93: "A: We disagreed with the fact that we could find a location that could replace the World Trade Center. We felt that there was no place anywhere in the United States that was even remotely like the World Trade Center."); Deposition of Michael J. Dunn, Exhibit 4 to Affidavit of Finley Harckham (p. 40: "Q: ...Let me back up. On this issue of uniqueness, that – this is RBA's position, right, it's unique? A: Yes."); *see also* Affidavit of Kathy Self, paragraph 13. Indeed, RBA's Memorandum states that, "RBA's BI claim was based on the hypothetical time to rebuild the WTC because RBA could not find a location with the same retail environment and operating conditions as that which existed at the WTC."

These items of evidence, and the very use of the word "unique" to describe the World

Trade Center mall as a retail location show that RBA will not be satisfied with a Period of Liability that is not tied to the rebuilding of the World Trade Center complex and its surroundings. RBA does not believe that any retail space anywhere in the United States is comparable to the World Trade Center complex as it existed before 9/11, and this entire argument is a disingenuous attempt to confuse the issue and disguise RBA's true intent.

2)    **RBA's claimed Period of Liability is tied not just to the "World Trade Center," but to the entire World Trade Center complex and all of its surroundings.**

RBA has attempted to scale back the aggressiveness of its position by claiming that if no comparable retail environment can be found, it is entitled to a Period of Liability extending to the time necessary to rebuild the World Trade Center. In fact, what RBA seeks is not only the rebuilding of the World Trade Center, but the entire complex and all its surroundings. In effect, RBA asks this Court to force FM Global to restore the world to its pre-9/11 condition, a feat which no insurer, or anyone else, could ever do.

In his deposition, Jim Bettner, the risk manager for Luxottica and the person who had primary responsibility for assembling RBA's 9/11 claim, testified that he and RBA based their claimed Period of Liability on the hypothetical time necessary to rebuild the entire World Trade Center complex and the surrounding area. Deposition of James S. Bettner, p. 36, Exhibit 8 to Affidavit of Finley Harckham; *see also* Deposition of Brian Baumann, pp. 21-23, Attached to Affidavit of Emily P. Hennen as Exhibit 4. The World Trade Center complex, as the Court is surely aware, encompassed a vast amount of retail and office space, as well as a major subway access site and even unconnected buildings across the street from the mall area. Even if RBA limited its measurement to the physical time needed to rebuild this vast complex, the Period of Liability would be unreasonably distorted and extended far beyond the clear confines of the insured property and the Policy.

- 11 -

But RBA does not truly limit its Period of Liability to the rebuilding of the World Trade Center complex. By claiming the Policy entitles it to a "comparable retail environment," RBA argues that FM Global must not only replace the physical structure of every retail store, office space, restaurant, and hotel in the complex and surrounding area; but that it must also replace every person, whether an office worker, a commuter, or a tourist, who might have passed through the area on a given day. FM Global would also have to ensure that the same or equivalent retail competitors would occupy the rebuilt space that occupied the World Trade Center pre-9/11. *See* Affidavit of Kathy Self, paragraphs 8, 9, 10, 11. Mr. Bettner stated that restoring the same or equivalent physical and operating conditions included "replacement of the World Trade Center and the demographics and the co-tenancy, meaning all the other great businesses that were around it." Mr. Bettner went on to say that the demographics he mentioned included people who worked in the World Trade Center towers, as well as those who worked in surrounding buildings. Deposition of James S. Bettner, pp. 25-28, Attached as Exhibit 3 to Affidavit of Emily P. Hennen. Replacing all this would be, of course, impossible. Even if the World Trade Center complex were rebuilt, brick for brick, there is no way to predict whether the same number of people would work in or otherwise frequent the complex or surrounding area, or if the same or similar retailers that occupied the mall area before 9/11 would return. It would be unreasonable to read FM Global's Policy in such a manner as to require it to protect against a risk that would be impossible to estimate or evaluate. RBA's reading of the Period of Liability is simply unreasonable, and FM Global asks this Court to reject it outright.

**F.      Relevant case law does not support RBA's position.**

RBA cites three cases in support of its claimed Period of Liability. Each of these three cases is easily distinguishable, as each addressed a situation in which the viability of the

insured's business was tied to the existence of the World Trade Center. That situation does not exist here, and this matter should be decided similarly to the number of cases in which courts have refused to tie the length of a period of business interruption to the rebuilding of the World Trade Center.

RBA cites *Zurich American Ins. Co. v. ABM Industries, Inc.*, 387 F.3d 158 (2d Cir. 2005); *SR Int'l Business Ins. Co. v. World Trade Center Properties*, No. 01 Civ. 9291, 2005 WL 827074 (S.D.N.Y. Feb. 15, 2005); and *Int'l Office Centers Corp. v. Providence Washington Ins. Co.*, No. 3-04-CV-990, 2005 WL 2258531 (D.Conn. Sept. 16, 2005). None of these cases supports RBA's position.[3] In footnote 3 to its Memorandum, RBA incorrectly claims that *ABM* involved a question of insurable interest that is not present here. In fact, the question of insurable interest is exactly the issue which distinguishes the holding in *ABM* from this case. As RBA concedes in this footnote, "the court agreed with the policyholder and held that it was entitled to BI coverage based upon the destruction of the WTC because it used common areas and tenants' premises in its work." Indeed, the use of the common areas and the premises of other World Trade Center tenants was the sole fact that led the *ABM* court to conclude that ABM could tie the period of business interruption to the rebuilding of the World Trade Center. RBA cannot claim that it similarly used the World Trade Center, and *ABM* is thus inapplicable here.

*International Office Centers* and *World Trade Center Properties* are cases very similar to *ABM*, in that the ultimate holdings were centered on the fact that the World Trade Center itself provided the base for the insured's business. Although RBA's World Trade Center stores may have been their highest grossing, RBA cannot reasonably claim that the very existence of RBA's business depended in any way on the World Trade Center itself. RBA could and did continue to

---

[3] For a more involved discussion of each of these cases, FM Global refers the Court to its Reply Memorandum in Support of its Motion for Partial Summary Judgment. In the interest of economy, FM Global limits its discussion of these cases here.

- 13 -

operate hundreds of other retail stores nationwide after 9/11, a fact which renders the current case easily distinguishable from the cases cited by RBA.

The current situation is much more akin to that in *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384 (2nd Cir. 2005). There, contrary to RBA's assertions, the Second Circuit held that the insurance policy in question did not insure the World Trade Center, and limited Duane Reade's period of restoration to the time needed to replace its lost store elsewhere. *Id.* at 398. As to the Leasehold Interest discussion RBA claims supports its position, the Second Circuit stated that "the coverage provided by the Leasehold Interest clause is decidedly different than the one Duane Reade seeks under the policy's BI clause." *Id.* at 397. The FM Global Policy here also provides Leasehold Interest coverage, but that coverage is not at issue here.[4] The focus of these Cross-Motions for Partial Summary Judgment is the length of the Period of Liability, and on this issue, *Duane Reade* is apposite. The Second Circuit recognized that a retail store, one of many stores under a blanket policy, did not depend on the World Trade Center for its existence, despite the profits it may have earned there, and that the period of restoration must be limited to the time necessary for the insured to replace its lost store at an alternative location. *Id.* at 398.[5]

RBA's claim that the Policy guarantees "functionally equivalent operations" is incorrect. As explained above, the Period of Liability ends when the replacement stores can be *made ready to operate* under equivalent conditions, not when those external conditions in fact exist. The Policy's language is not unique in its intent, and FM Global is confident that the *Duane Reade*

---

[4] See Exhibit 5 to Harckham Affidavit, p. 27 (RBAFM 000000030).
[5] Contrary to RBA's assertion, FM Global has never claimed that RBA's entire business interruption claim is barred by the "loss of market" exclusion. FM Global has always acknowledged that RBA has a covered business interruption loss. Rather, FM Global's position is that the loss of market exclusion limits the amounts recoverable by RBA for the loss of consumer traffic in the Lower Manhattan area after 9/11. Because this exclusion must be read in conjunction with the portions of the Policy that provide for the measurement of lost sales, rather than the length of the Period of Liability, the discussion in Duane Reade is not applicable here.

court would address this case in similar fashion.

## CONCLUSION

RBA's claimed Period of Liability is unsupported by either Policy language or relevant case law. Further, what RBA asks this Court to do is require FM Global to replace the entire World Trade Center complex, its surroundings, and all the people who trafficked the area, an absurd result that no insurer could ever achieve. FM Global has always maintained that RBA is entitled to business interruption insurance until such time as, with due diligence and dispatch, RBA could replace its lost stores at an alternative location and make them ready for operations at that location. This is the only reasonable reading of this unambiguous Policy term. FM Global therefore asks the Court to deny RBA's Cross-Motion for Partial Summary Judgment.

Dated: Minneapolis, Minnesota.
October 13, 2006

Respectfully submitted,
**ROBINS, KAPLAN, MILLER & CIRESI L.L.P.**

By: /s/ Emily P. Hennen
David S. Evinger
Terrence R. Joy
Emily P. Hennen
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN  55402-2015
612-349-8500

-and-

PODVEY,   MEANOR,   CATENACCI,   HILDNER,
COCOZIELLO & CHATTMAN, P.C.
Henry J. Catenacci (HC 8376)
Helaine Miller (HM 8945)
The Legal Center
One Riverfront Plaza - 8th Floor
Newark, NJ 07102
(973) 623-1000

400 Park Avenue
Suite 1420
New York, New York 10022
(212) 432-7419

*Attorneys for Defendant*
*Factory Mutual Insurance Company*

- 16 -