

Potter
Anderson
& Corroon LLP

1313 North Market Street
P.O. Box 951
Wilmington, DE 19899-0951
302 984 6000

www.potteranderson.com

**David J. Baldwin**
Partner
Attorney at Law
dbaldwin@potteranderson.com
302 984-6017  Direct Phone
302 658-1192  Fax

September 10, 2007

**BY e-FILE and HAND DELIVERY**
The Honorable Mary Pat Thynge
United States Magistrate Judge
Federal Building
844 North King Street
Room 6100
Wilmington, DE 19801

Re:     Howard Hughes Medical Institute v. Factory Mutual Insurance Company,
        Civil Action No. 07-420

Dear Judge Thynge:

Pursuant to the Court's Order, dated September 4, 2007, Plaintiff Howard Hughes Medical Institute ("HHMI") respectfully submits this letter brief in opposition to the Motion for Protective Order (the "Motion") filed by Defendant Factory Mutual Insurance Company ("FM") on August 30, 2007.

## Summary of Argument

FM contends that a complete stay on all discovery is necessary here to further the "interests of justice and judicial economy." See Motion at p. 3. As an initial matter, FM's Motion completely fails to identify any legally cognizable "burden" that would excuse FM from the basic discovery obligations that apply to all parties under the Federal Rules of Civil Procedure ("FRCP"). Moreover, the Motion fails to acknowledge that this insurance coverage dispute involves divergent interpretations of HHMI's insurance policy, and does not simply relate to the valuation of HHMI's damaged property. Ultimately, the two amorphous tenets on which FM's Motion does rely – the interests of justice and judicial economy – demand that FM's request for a total stay on discovery be denied. First, because most of HHMI's document requests are relevant to issues underlying FM's forthcoming motion to compel an appraisal, the interests of justice actually require that FM produce the requested discovery so that HHMI can properly respond to FM's appraisal motion. To deprive HHMI of such discovery before having to respond to FM's appraisal motion would greatly prejudice HHMI on a key procedural issue in this litigation. Second, the interests of judicial economy will not be compromised by holding FM to the standard discovery obligations under the FRCP, since the discovery sought by HHMI will eventually be turned over by FM anyway, either in this Court or in an appraisal proceeding.

The only interest served by a complete stay on all discovery would be FM's interest in maintaining the current imbalance of access to information in this case. HHMI has already provided all information necessary for FM to analyze and respond to the insurance claim at issue, but FM has essentially refused to provide practically any documents or details regarding its internal analysis and decision to resist payment for over $1.7 million of HHMI's covered losses. FM's statement that "the vast majority of those documents [regarding the cost to repair HHMI's property damage] have already been exchanged by the parties in the course of the adjustment of the claim" (see Motion at p. 4) is misleading at best. In reality, since the fire itself, HHMI has provided FM with a constant stream of documents and information in the course of submitting its insurance claim, including volumes of backup documentation for the claim and other detailed information specifically requested by FM, but has received from FM little more than some correspondence and a one-inch binder regarding FM's analysis of the claim.

Indeed, if it were true that "the vast majority" of FM's documents regarding the claim had already been turned over to HHMI, then how could the basic discovery obligations under the FRCP pose an "undue burden" for FM? Why would FM seek a complete stay on all discovery instead of simply noting that it has already turned over the documents responsive to those discovery requests that it deems relevant, and raise objections to those requests that it believes are beyond the scope of discovery? The answer is clear – FM knows the importance of the material sought by HHMI and wants to keep that material from HHMI while FM prematurely attempts to steer this case into appraisal.

## FACTUAL BACKGROUND

This lawsuit involves an insurance coverage dispute. FM sold HHMI a blanket property insurance policy (the "Policy") that covered over sixty locations across North America, including HHMI's state-of-the-art Janelia Farm campus, which suffered a fire loss while still under construction. In part because HHMI had critical commitments that depended on the timely completion of the Janelia Farm project, HHMI entered into a "lump sum" contract following the fire with the general contractor – Turner Construction Company ("Turner") – under which HHMI attempted to mitigate its losses by agreeing to pay Turner a total of $10.1 million to expedite the repair of the damage from the fire in the hopes of completing the project on or close to the original schedule. HHMI submitted its claim for covered losses under the Policy of approximately $5.2 million, including approximately $4.3 million paid to Turner to replace the damaged property that existed at the time of the fire. The $4.3 figure that HHMI included as part of its insurance claim was the portion of the "lump sum" contract attributable to the repair and replacement of the property that existed and was damaged at the time of the fire.

In response, FM refused to cover approximately $1.7 million of HHMI's claim, and paid HHMI only slightly more than $3.5 million. The majority of the deficit in FM's payment – approximately $1.3 million of the $1.7 million shortfall – relates to a dispute between the parties regarding the scope of the costs incurred under the "lump sum" contract with Turner. Thus, this lawsuit hinges upon at least one or two coverage issues – legal questions that cannot be determined in an appraisal and, therefore, must be resolved by the Court: (i) the interpretation of the relevant part of the "Valuation" provision in the Policy, which provides HHMI with coverage for "the cost to rebuild or replace on the same site with new materials of like size, kind, and

The Honorable Mary Pat Thynge
September 10, 2007
Page 3

quality"; and (ii) the interpretation of the "Expediting Costs" provision in the Policy, which provides HHMI with coverage for "the reasonable and necessary costs incurred . . . to expedite the permanent repair or replacement of such damaged property." In short, even if there was a difference between the $4.3 million that HHMI paid Turner to repair or replace the fire damage to HHMI's state-of-the-art facility and some lesser amount that FM thinks it should have cost to make generic repairs to a run-of-the-mill building, the difference between those two figures would be covered under the Policy by virtue of either: (i) FM's promise in the Valuation provision to cover the cost to rebuild with "materials of like size, kind, and quality"; or (ii) the fact that any such difference is attributable to a premium paid to Turner to expedite the repair of the fire damage and keep the project on schedule, which FM promised to cover via the Expediting Costs provision.

## ARGUMENT

### A.  HHMI Is Entitled to Discovery Responses To Oppose FM's Motion To Compel Appraisal

FM argues that the discovery sought by HHMI is not relevant to its forthcoming motion to compel appraisal. See Motion at p. 4. Yet as FM concedes, the basis for its appraisal motion will be FM's "contention that this dispute is solely about differences in value of the claim at issue" (Motion at p. 4) – i.e., the nature of FM's refusal to pay. Contrary to FM's argument in the Motion, the appraisal clause and case law relating thereto are largely irrelevant to resolution of that issue; rather, what is relevant is FM's view, and HHMI's view, as to FM's failure to pay. In other words, does the difference between the parties relate in part to the legal meaning of the Policy, or does it simply relate to the valuation of the property damage? Obviously, resolution of that issue is impossible without the basic factual discovery regarding FM's assessment of HHMI's claim which HHMI's discovery requests seek. Indeed, FM admits as much when it states that "it will obviously be necessary for the parties to exchange documents in support of their respective positions" regarding the cost to repair the fire damaged building. Motion at p. 4.

Clearly the following examples from HHMI's discovery requests seek evidence relevant to the reasons for FM's refusal to pay, as well as FM's belief that this coverage dispute needs to be resolved in an appraisal, and HHMI will be prejudiced if it is denied access to such discovery for use in opposing FM's appraisal motion:

- Interrogatory No. 9, which seeks the facts, circumstances and documents that FM contends support its affirmative defenses, including FM's affirmative defenses that: (i) "the claims of HHMI are barred by the terms and conditions of the Policy" (see Affirmative Defense #3); (ii) certain of the amounts claimed by HHMI under the Policy are not covered under the Expediting Costs provision in the Policy (see Affirmative Defense #7); (iii) certain of the amounts claimed by HHMI under the Policy are not covered under the Valuation provision in the Policy (see Affirmative Defense #8); and (iv) this dispute must be resolved via appraisal (see Affirmative Defense #9);

The Honorable Mary Pat Thynge
September 10, 2007
Page 4

- Interrogatory Nos.13-15, which seek details regarding FM's rationale for its decision to pay some parts of the claim and to refuse to pay other parts;

- Interrogatory Nos. 16-20, which seek details regarding FM's coverage analysis under the Expediting Costs provision and any purportedly applicable exclusions; and

- Document Request Nos. 1, 2 and 6, which seek details regarding FM's coverage analysis and handling of the claim.

Under the FRCP, parties are entitled to discovery of evidence relevant to procedural motions before such motions are heard by the Court. Indeed, a party's inability to obtain such discovery has been held to be grounds for overturning the procedural motion itself. See Renner v. Lanard Toys Ltd., 33 F.3d 277, 283 (3d Cir. 1994) (reversing the District Court's decision to dismiss action for lack of personal jurisdiction where the District Court declined to grant limited discovery); Sandvik AB v. Advent Int'l Corp., 83 F. Supp. 2d 442, 446 (D. Del. 1996) ("Courts commonly permit the plaintiff to conduct limited discovery to determine whether the defendants have adequate contacts with the forum."); see also Trancinda Corp. v. Daimlerchrysler AG, 197 F. Supp. 2d 86 (D. Del. 2002). Accordingly, FM should not be allowed to restrict HHMI's access to discovery relevant to the forthcoming appraisal motion here.

**B.    Staying Discovery Would Not Foster Economy**

FM makes various arguments based on judicial economy, but completely fails to explain how judicial economy would be served by postponing discovery until an appraisal that FM wants to convene before this Court can define the scope of coverage provided under the Policy. As will be discussed in detail in HHMI's opposition to the forthcoming appraisal motion, such coverage issues cannot be resolved in an appraisal. FM cannot possibly show that the system or the parties would be served by asking an appraisal panel to make various, alternative judgments of value based upon what they guess this Court would do with the coverage issues, or if this Court eventually had to vacate an appraisal award for having made coverage determinations.

Further, FM's unilateral "belief" that it is possible that appraisal "could" resolve all the issues in this case (see Motion at p. 3) is simply not good enough to deprive HHMI of its right to discovery under the FRCP. Ultimately, FM agrees that it will be obligated to produce much of the material sought in an appraisal. See Motion at p. 4. FM cannot be permitted to argue that producing that material here and now – as any other litigant would have had to do under the schedule set by the FRCP – is so burdensome that it is relieved from all discovery obligations under the rules. In other words, the burden of production is not "undue" simply because it must be made in conformance with the schedule set by the drafters of the FRCP.

As far as HHMI can tell, the core of FM's argument – which FM never states expressly – is that it believes it can convince an appraisal panel that FM is not obligated to produce documents that it would be obligated to provide under the FRCP, and, therefore, that it would be unduly burdensome for it to produce documents required under the FRCP. FM then identifies a few categories of information sought, such as claims materials, and queries how such material would be relevant "to the issue to be resolved at appraisal, namely, the value of the cost to repair the

The Honorable Mary Pat Thynge
September 10, 2007
Page 5

fire damaged building." Motion at p. 4.[1] Putting to one side the fact that this is not the issue separating the parties – HHMI provided the cost to repair the building and FM has refused to pay it – FM is simply wrong about the scope of its discovery obligations should there be an appraisal. FM points to nothing that limits in any way what an appraisal panel can direct the parties to produce. Further, the materials sought by HHMI are indisputably relevant in an appraisal despite the absence of rules such as exist in this Court regarding materiality and relevance. For instance, a statement by an FM employee that the policy permits HHMI to recover its full claim under the Policy has certain implications under this Court's rules regarding party admissions, but it also has plain power to any fair appraiser with regard to the value of HHMI's claim.

Since the discovery sought by HHMI will have to be produced by FM in the event of an eventual appraisal, the interests of judicial economy do not justify relieving FM of its fundamental discovery obligations under the FRCP. Accordingly, the Motion should be denied.

Respectfully submitted,

David J. Baldwin

Enclosure
817793
cc: Robert S. Goldman, Esq. (via e-File and hand delivery (w/encl.)
    Thomas Brown, Esq. (via e-mail) (w/encl.)

---

[1] FM's counsel also incorrectly represented to the Court during the September 4, 2007 teleconference that HHMI's discovery requests were "mainly related to underwriting information, policy issuance information, policy sales information" – a contention not repeated in FM's Motion because it clearly is belied by the fact that only eight of HHMI's 28 discovery requests reference issues relating to the underwriting, issuance or sale of insurance. See Transcript of Telephone Conference in this Action, dated Sept. 4, 2007, attached hereto as Exhibit A, at p. 6.

# Exhibit A

```
 1                 IN THE UNITED STATES DISTRICT COURT

 2                 IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -

   HOWARD HUGHES MEDICAL INSTITUTE,
 4                                        :    CIVIL ACTION
               Plaintiff,                 :
 5                                        :
               v.                         :
 6                                        :
   FACTORY MUTUAL INSURANCE COMPANY,      :
 7                                        :    NO. 07-420 (***)
               Defendant.
 8                              - - -

 9                       Wilmington, Delaware
               Tuesday, September 4, 2007 at 9:00 a.m.
10                       TELEPHONE CONFERENCE

11                              - - -

12   BEFORE:   HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE

13                              - - -
     APPEARANCES:
14

15             POTTER ANDERSON & CORROON, LLP
               BY:  DAVID J. BALDWIN, ESQ.
16
                    and
17
               ANDERSON KILL & OLICK, P.C.
18             BY:  MARSHALL GILINSKY, ESQ.
                    (New York, New York)
19
                         Counsel for Plaintiff
20

21             PHILIPS GOLDMAN & SPENCE, P.A.
               BY:  ROBERT S. GOLDMAN, ESQ.
22
                    and
23

24
                                       Brian P. Gaffigan
25                                     Registered Merit Reporter
```

```
 1     APPEARANCES:   (Continued)

 2
                     GIBBONS, P.C.
 3              BY:  THOMAS S. BROWN, ESQ., and
                     ANDREW SMITH, ESQ.
 4                   (Philadelphia, Pennsylvania)

 5

 6                            - oOo -

 7                      P R O C E E D I N G S

 8              (REPORTER'S NOTE:  The following telephone

 9     conference was held in chambers beginning at 9:00 a.m.;

10     roll call taken down, not transcribed but entered as

11     appearances.)

12              THE COURT:  Good morning.  Have all of you had

13     an enjoyable few days off?  The weather was perfect.

14              MR. BROWN:  Yes, it was.  It was beautiful.

15              THE COURT:  We couldn't have asked for anything

16     better.  It's a good way for summer to end.  I still have it

17     in my blood that it still exists.

18              I think the purpose of today's call was

19     basically to discuss the schedule and whether or not the

20     parties are interested in consenting to the Magistrate Judge

21     and that would, of course, influence the schedule probably.

22     And I think that is about it, from what I recall.

23              Does anybody have anything different on their

24     mind at this time?

25              MR. BROWN:  Your Honor, this is Tom Brown.  I
```

```
 1   think one of the principal things we were going to report
 2   back on was whether our respective clients were agreeable to
 3   have Your Honor rule on a motion to compel appraisal.
 4              THE COURT:  Yes, I think that is out there.
 5   Yes.  Well, you have everything.  No, no.  A motion to
 6   transfer venue.
 7              MR. GILINSKY:  Right.  This is Marshall
 8   Gilinsky.  There is a motion to transfer venue that has been
 9   briefed by the parties.  When we were last on the phone last
10   week, Your Honor had suggested it might be more expedient to
11   get to the heart of the matter if that motion got tabled and
12   in its place, defendants were to make a motion to compel
13   appraisal and make that motion in this court and have it
14   heard by Your Honor.
15              THE COURT:  Yes, that was it.
16              MR. BROWN:  Right.
17              THE COURT:  Thank you.
18              MR. GILINSKY:  And so we did consult with our
19   respective clients last week.  I think we came to the
20   conclusion, collectively, that our clients would be happy to
21   have Your Honor hear at least that motion on behalf of HHMI.
22   My client would be content to have Your Honor hear that
23   motion as well as a motion for summary judgment that we
24   would make, should the motion for appraisal not be granted,
25   but that is a bridge we can cross when we get to it.
```

```
 1              THE COURT:  Okay.  We can do it piecemeal.
 2              MR. BROWN:  Factory Mutual concurs we would be
 3    pleased to have Your Honor rule on the to-be-filed motion
 4    for appraisal.
 5              THE COURT:  You need to do a consent or
 6    stipulation just limited to consenting on the motion to
 7    compel appraisal and that you just have a signature line for
 8    a judge.  Don't worry about who it is because it changes on
 9    a weekly basis who is serving from the District Court Judges
10    as the duty judge.  Whoever gets that will just sign off on
11    it.  The format is not atypical from consenting to the
12    jurisdiction of the Magistrate Judge.  You just kind of put
13    in language limiting that.
14              In light of that, what do we do now with the
15    scheduling order?
16              MR. GILINSKY:  This is Marshall Gilinsky again.
17    It seems to me that the scheduling order could just stay in
18    place more or less as it is.  And this is just a preliminary
19    motion then.
20              It seems to me that discovery should go forward
21    notwithstanding the submission by the defendants of their
22    motion to compel appraisal since the discovery that has been
23    solicited so far almost entirely goes to the questions that
24    relate to, well, not entirely but almost entirely goes to
25    questions relevant to their motion to seeking appraisal.  So
```

```
 1    we would want that discovery for use in opposing their
 2    motion.  And, by and large, its information that would be
 3    discoverable in the appraisal itself in any respect, so I
 4    don't think we would have to make any modifications to the
 5    existing scheduling order as we discussed it last week.
 6              MR. BROWN:  Your Honor, this is Tom Brown.  I'm
 7    going to disagree.  We filed a motion for protective order
 8    at the end of last week which Your Honor may not have yet
 9    seen it or, Marshall, I'm not sure you have seen it yet.
10              MR. GILINSKY:  I haven't.
11              MR. BROWN:  What we point out in that motion,
12    among other things, is that the discovery that is sought
13    relates primarily to underwriting and adjustment-based
14    issues that go, we believe, more toward any bad faith claim
15    or other such claim that plaintiffs intend to ultimately
16    make and is not anywhere close to being relevant to the
17    valuation issues that would be at the heart of an appraisal.
18    All documentation that an appraisal panel would need to
19    appraise this loss would be submitted pursuant to a protocol
20    that Mr. Gilinsky would negotiate.  In fact, the parties
21    already have the vast majority of those documents in the
22    course of the adjustment of the client.
23              So there is really nothing we believe contained
24    in those discovery requests that would be relevant to the
25    appraisal.  So our request, as stated in the motion for
```

1   protective order, is that all discovery be stayed until the
2   motion to compel appraisal is filed and resolved. And if
3   the parties even have to go forward with litigation at some
4   point down the road, which, as we've submitted in our motion
5   for protective order, we don't think is going to be the
6   case, then we'll revisit the issue of the scheduling order
7   discovery as to remaining issues, et cetera.
8           THE COURT:  Now, I just want to try to
9   understand something. The discovery that is presently
10  outstanding, is that both interrogatories and document
11  requests?
12          MR. GILINSKY:  Yes.
13          MR. BROWN:  Yes, Your Honor.
14          THE COURT:  And there are probably discovery
15  requests in there that go to valuation issues?
16          MR. BROWN:  This is Tom Brown, Your Honor.  I
17  don't believe that is the case.  When we looked at them, it
18  was mainly related to underwriting information, policy
19  issuance information, policy sales information.
20          MR. GILINSKY:  Well, Your Honor, I can read to
21  you a couple of these just to give you a flavor for them.
22          THE COURT:  Hold on for one moment.  When you
23  did your motion for a protective order, Tom, did you include
24  copies of the discovery?
25          MR. BROWN:  Yes, we did.

```
 1              THE COURT:  Okay.  I have not seen it and I have
 2   not read it.
 3              MR. BROWN:  Okay.
 4              THE COURT:  And I don't think plaintiff's
 5   counsel has either so asking for him to respond at this time
 6   I don't think is entirely fair.
 7              MR. BROWN:  I understand.
 8              THE COURT:  And since it's a motion, what I'm
 9   going to do is -- I hate motions.  I wouldn't have minded a
10   letter but I hate motions.  Are we all in the same time
11   zone?
12              MR. BROWN:  Yes.
13              MR. GILINSKY:  Yes.
14              THE COURT:  As I ask that question, I'm assuming
15   we're all in the Eastern time zone.  So today's Tuesday so
16   I'm looking at probably, how does 4:30 on Wednesday,
17   September 12th work on everybody's schedule?
18              MR. BROWN:  Wednesday when, judge?
19              THE COURT:  September 12th, next week.
20              MR. BROWN:  Let me double-check that real quick.
21              THE COURT:  I want to at least give enough time
22   for me to read it and to give Marshall enough time to be
23   able to read it and also to, if he wants to provide a
24   response, to provide a response by a date certain.
25              MR. GILINSKY:  What time, Your Honor?
```

```
 1              THE COURT:  I'm looking at 4:30 in the
 2   afternoon, counsel.  I can do it later or I can do it at
 3   8:00 o'clock in the morning.
 4              MR. GILINSKY:  I would be able to do it at 8:00
 5   o'clock in the morning.  I apologize.  It's a Jewish holiday
 6   that night.
 7              THE COURT:  See, that is what I was concerned
 8   about with Rosh Hashanah.  I saw that.  I didn't think the
 9   first day of Ramadan would bother people.
10              MR. GILINSKY:  You never know.
11              THE COURT:  You never know anymore is right.  I
12   don't have a problem with doing it at 8:00 o'clock in the
13   morning.  Can you do it at 8:00 o'clock in the morning, Tom?
14              MR. BROWN:  That's fine.
15              THE COURT:  We'll do it at 8:00 o'clock because
16   I have a whole series of teleconferences and I want to put
17   in enough time for this.  And since this was essentially
18   your motion, Tom, you will be the one introducing the phone
19   call, organizing it.
20              MR. BROWN:  That would be fine.
21              MR. BALDWIN:  Your Honor, this is David Baldwin.
22   It seems they filed a motion and not the letter.  Do you
23   want a letter from us?
24              THE COURT:  Yes, I want a letter from you,
25   David.  That's fine.
```

```
 1              MR. BALDWIN:  Okay.  Thank you.
 2              THE COURT:  And how long was the motion,
 3   excluding the attachments?  I'm assuming it was double
 4   spaced.
 5              MR. GILINSKY:  Yes, it was less than 10 pages.
 6   Oh the motion itself, it was a couple pages, and there is a
 7   brief that is probably --
 8              THE COURT:  You did a brief?
 9              MR. GILINSKY:  Yes.
10              THE COURT:  This is a discovery issue.  Although
11   I hadn't executed an order yet, we usually do the normal
12   approaches to this.
13              Dave, why don't you take five pages, do it in
14   letter format, 12 point font so I can read it.  And can you
15   have it in to me by September 10th?
16              MR. BALDWIN:  Yes, Your Honor.
17              THE COURT:  Okay.  No further briefing on this,
18   and I'll address the issue then at 8:00 o'clock on
19   Wednesday, September 12th.
20              Do you happen to know what docket entry it was
21   by any chance, Tom?
22              MR. BROWN:  I do not.  I can find out and get it
23   to your chambers.
24              THE COURT:  No, that's not a problem.  We can
25   pull it up and look at it.  Was anything filed under seal?
```

```
 1              MR. BROWN:  No.
 2              THE COURT:  Okay.
 3              MR. BALDWIN:  Your Honor, this is David Baldwin.
 4    I'm just pulling it up.  Docket entries 16 and 17 are the
 5    motion and the brief.
 6              THE COURT:  Okay.
 7              (Mr. Gilinsky speaks softly.)
 8              THE COURT:  Was that something you wanted on the
 9    record?
10              MR. GILINSKY:  Might as well be.
11              THE COURT:  You don't have to have it on the
12    record.  We just heard mumbling so I wanted to make sure you
13    weren't talking to me.
14              MR. GILINSKY:  Yes, Your Honor.  This is
15    Marshall Gilinsky.  I just wanted to confirm since we got on
16    to this topic talking about how we were going to proceed
17    with this scheduling order, my understanding was that we
18    would wrap up our discussion about the discovery order when
19    we get together a week from Wednesday and talk about the
20    discovery motion.
21              THE COURT:  Yes, and that's it.  And also we
22    need to talk about when, Tom, you are going to be filing
23    your motion ... to compel appraisal.
24              MR. BROWN:  To compel appraisal.
25              THE COURT:  Yes.
```

1         MR. GILINSKY: We can talk about that now in
2   terms of when the motion would be filed but I would want to
3   know whether or not we were going to be getting any
4   discovery in terms of setting a deadline for our opposition.
5         THE COURT: Wait a minute. I don't understand
6   what you just said.
7         MR. GILINSKY: We can talk about a briefing
8   schedule on the motion that FM plans to file compelling
9   appraisal, but when setting a date for HHMI's opposition to
10  that motion, I want to take into consideration whether and
11  when we're going to get discovery.
12        THE COURT: And what discovery request do you
13  think go to opposing the motion to compel appraisal?
14        MR. GILINSKY: There are a number of them. The
15  first two document requests asks for claim files. The
16  fourth document requests asks for claims manuals. The sixth
17  document request asks for documents that they've relied upon
18  in denying and refusing to pay part of the claim. All of
19  this could evidence the existence of legal issues in FM's
20  handling of the claim which would support our argument that
21  the claim does not encompass only valuation issues but
22  rather also includes legal issues that would necessitate the
23  court's attention before in order to frame the claim for an
24  appraisal, if one becomes necessary. And that's just an
25  example. There are more document requests that go to

1  similar or equally relevant issues.
2  THE COURT: Well, your argument then is this.
3  That valuation isn't the sole issue, which I understand, but
4  can't the case be split so you have valuation as well as do
5  whatever you need to do in this court on your other
6  arguments?
7  MR. GILINSKY: Yes, but I think the question is
8  which has to come first.
9  THE COURT: Okay.
10  MR. GILINSKY: And there is a lot of precedent
11  out there that says you don't just go off into valuation
12  because you put yourself in a situation where you might end
13  up having to do it twice. So let the court resolve the
14  legal issues. That way, when you go into these evaluations,
15  you are focused on the correct issues and you don't end up
16  having the appraiser applying the wrong legal standard and
17  then have to do it over again.
18  MR. BROWN: Well, there is no sense in
19  disagreeing now. It will be addressed in our appraisal
20  issue. Frankly, judge, it's just the opposite. By
21  resolving valuation issues at appraisal, you resolve the
22  fundamental question, which is how much does it cost to
23  repair the fire damage to this building? If there are
24  coverage issues, which is what Mr. Gilinsky is talking about
25  when he says legal issues, if there are coverage issues that

1  remain thereafter, those can get resolved, but those can be
2  stayed until the appraisal panel does its evaluation or its
3  appraisement of the valuation issue.  You put the cart
4  before the horse if you look to create coverage issues
5  before the crux of the matter is resolved, which is what was
6  the value of the damage to the building as a result of the
7  fire.
8              THE COURT:  Okay.  I will --
9              MR. BROWN:  So it becomes part and parcel, I
10 guess, and the issues get somewhat intertwined, but my
11 response to this question about whether claims manuals,
12 adjustment documents, et cetera, are relevant to the
13 question of the value of the repairs, absolutely not.
14             THE COURT:  Well, I understand what you are
15 saying and will hold off doing anything until September
16 12th.  And I will be looking forward to your response on the
17 motion for a protective order on September 10th.  And then
18 we will deal with that motion and the schedule and see what
19 we're going to do, see what discovery is going to be
20 allowed, and that way we can put into play some type of
21 schedule for the motion to compel appraisal as well as the
22 rest of the schedule, too, see whether or not the two
23 dovetail together.  And whether I agree with both of you or
24 agree with either one of you or agree in part with both of
25 you, you may still end up doing some form of discovery.

```
 1   Okay?
 2              MR. BROWN:  Okay.  Sounds good.
 3              MR. GILINSKY:  Great.
 4              THE COURT:  Thank you all.
 5              MR. GILINSKY:  Thank you, Your Honor.
 6   Appreciate it.
 7              THE COURT:  Yes.  We'll talk to you on the 12th.
 8              MR. BALDWIN:  Thank you, Your Honor.  Good-bye.
 9              THE COURT:  Good-bye.
10              (Telephone conference ends at 9:16 a.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```